UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELIZABETH BOLGER, et al.<br><br>Plaintiffs,<br><br>v.<br><br>DISTRICT OF COLUMBIA, et al.<br><br>Defendants. | Civil Action No. 03-906 (JDB) |

PLAINTIFF'S MOTION FOR SANCTIONS AND RELATED RELIEF
FOR DISCOVERY ABUSE
PERPETRATED BY THE DISTRICT OF COLUMBIA

Plaintiffs move for discovery sanctions for the District of Columbia's flagrant abuse of the discovery process and failure to comply with this Court's discovery orders in its cover up of the involvement of the Federal Bureau of Investigation in the political interrogations of plaintiffs, peaceful protestors who were falsely arrested and politically profiled because many were wearing black clothing and as such were politically profiled by law enforcement to be anarchists.

As the Court knows, plaintiffs have specifically demanded production of the Command Center running resume for April 20, 2002. Running resumes are particularly critical because, along with recorded police channel communications, they are often the only contemporaneous record of MPD events, knowledge, actions and perceptions.

Not one, but *many* attorneys from the District of Columbia Office of the Attorney General (OAG) have represented to the Court and plaintiffs that no running resume has ever been in existence. None was produced, they repeatedly said, including in response to Court orders commanding production.

The District of Columbia, pressed for more information in a Rule 30(b)(6) deposition focused on the technical capabilities of the Command Center and whether a running resume was produced and stored, admitted this week that *not only has the running resume always been available, but that it was sent by the deponent to "Legal" through his chain of command in December, 2003 in response to plaintiffs' discovery requests and then again to Legal in February, 2006 in apparent response to the Court's discovery conferences.*

The document was disappeared apparently to cover up the joint actions of the MPD and FBI in which, based solely on illegal political profiling, the MPD engaged in a mass false arrest and provided the arrestees to the FBI for political interrogation as part of federal efforts to spy on and gather intelligence on anti-war and political activists.

Sanctions are requested for the District's violations of the discovery rules from the onset of plaintiffs' properly propounded discovery requests; its violations of and contempt for this Court's February 15, 2006 Order requiring the District to complete a thorough supplemental review of records and knowledge and to supplement its deficient discovery responses by March 31, 2006,[1] and the July 7, 2006 Order which specifically ordered production of the command center logs and other materials by July 31, 2006.

For years, plaintiffs have spend considerable litigation resources and expense, time and again demanding in discovery and before this Court the production of records and information that were expected to have been created and maintained consistent with MPD standard operating procedures during mass demonstrations.

[1] "Based upon the parties' representations at the discovery scheduling conference held on this date, it is hereby ORDERED that the discovery schedule in this action is modified as follows: Defendants shall provide plaintiffs with supplemental answers to interrogatories by not later than March 10, 2006; defendants shall provide plaintiffs with supplemental responses to requests for production of documents and other materials by not later than March 31, 2006" (minute order entered on February 15, 2006).

Document demands have been made by plaintiffs both categorically and specifically, as in the case of demands for the production of the contemporaneous event logs or "running resumes" produced by the MPD Command Centers.[2]

The Office of the Attorney General represented to this Court, not merely through one attorney but through several consecutive attorneys of record, that no running resumes had been produced.

Plaintiffs persisted in the demand for such records, but the representation repeatedly made by the District both in Court and out of Court was that none had ever been created. They denied its existence. Opposing counsel was dismissive, and at times mocking, of the insistence that these records had to have been made and that counsel has successfully obtained them in every single other mass demonstration case that counsel had litigated since 2000 in D.C.

The OAG's representations were buttressed by repeated assurances from counsels that thorough search and review of records had been undertaken and retaken again in response to court orders. *It is solely because of these representations of counsel, accepted because they were made by officers of the court, that the District escaped both its obligation to produce this critical material as well as any sanctions for its failure to do so.*

[2] For example, in plaintiffs' the April 7, 2006 status report, plaintiffs reported:

"The District has produced no logs or records from the Command Information Centers, including the J.O.C.C. (Joint Operations Command Center) / S.O.C.C. (Synchronized Operations Command Center or the I.O.C.C. (Intelligence Operations Command Center). The MPD Command Center structure was fully activated in anticipation of the April, 2002 IMF / World Bank protests. A function of the command centers is to produce contemporaneous running logs of events and reports from law enforcement related to protest activity and mass arrests."

<u>See</u> Plaintiffs' Status Report (docket entry no. 63).

Yet on Friday afternoon, March 23, 2007, the District of Columbia for the very first time produced a heavily redacted running resume of events logged contemporaneously through the Joint Operations Command Center (J.O.C.C.).

Discovery has been authorized and requests propounded since October 31, 2003 (docket entry no. 20). An already enlarged period of discovery was set to close on March 30, 2007.

*This is three and a half years of discovery and the District* - - *having denied the existence of the running resume* - - *released this central document seven days before the close of discovery when almost all depositions have been completed without this critical information.*

The catalyst for this production was the fact that on the next business day, Monday, March 26, 2007, the District of Columbia was required to produce a deponent to attest to operation of the J.O.C.C. during the underlying events and specifically to whether or not a running resume was produced.[3] The deponent was also to testify as to all efforts to search for the running resume.

---

[3] One of three areas of inquiry related to the Command Center logs demanded a deponent to testify as to: "The function of any command or communications centers used in connection with the April, 2002 protests, including

a. The I.O.C.C. (Intelligence Operations Command Center);
b. The S.O.C.C. (Synchronized Operations Command Center);
c. The J.O.C.C. (Joint Operations Command Center);
d. Whether any command or communications center or individual had the responsibility of maintaining a running log(s) of all activities and their dispositions as they occurred or were processed within or by that command center;
e. Whether any command or communications centers of individual had the responsibility of maintaining a control log of all intelligence activity or information reported by detectives and officers;
f. The procedures and processed whereby information coming into the Command Center(s) was logged, recorded, maintained and/or destroyed;
g. The identity of all persons who physically entered information into any data recording or computer systems in connection with the Command Center(s);
h. The identity of the custodian of all information/records that was produced by, through or within the Command Center(s);
i. The location and chain of custody of all media or documents reflecting or containing logs created by, within or through the Command Center(s);
j. All efforts to locate and review such media or documents in response to discovery requests in this matter;
k. All records retention and maintenance procedures and policies related to the preservation of Command Center logs or the underlying source information that was entered into such logs; and

Sergeant Doug Jones testified that in December, 2003 he personally first sent the running resume through his upward chain of command to "Legal" and that copy was inexplicably disappeared. Sergeant Jones sent a second copy of the running resume to Legal in February, 2006, after plaintiffs' counsel continued to challenge the District's willful failure to provide requested discovery responses The OAG continued to represent that the running resume never existed and had never been created.

The OAG was before this Court for multiple discovery conferences and never relented from its completely false claim that there was no running resume.

Much of the document is blacked out - - even though the District of Columbia has publicly released to plaintiffs' counsel its J.O.C.C. running resumes for other major protests with minimal purported cause for redaction, including of intelligence information.

The data that is not redacted, however, establishes that the District has covered up for years its knowledge of the FBI involvement of the unconstitutional interrogations of the plaintiffs which the MPD itself allowed and caused, as that term is used under 42 U.S.C. §1983.

In interrogatory requests, in violation of discovery rules and this Court's February 15, 2006 and July 7, 2006 discovery orders, the District has denied and covered up the fact that, with MPD apparent permission and in joint action, the FBI was on the scene engaged in political interrogations of activists:

- On May 6, 2005, the District initially provided sworn discovery responses representing that the only law enforcement officers on the scene were eleven uniformed MPD officers and two officers from the United States Secret Service, Uniform Division.[4]

---

l. All measures undertaken by the MPD to ensure the integrity and preservation of Command Center logs. See Ex. 1, Second Amended Notice of Rule 30(b)(6) Deposition of the District of Columbia at 2-3.

[4] The sworn May 6, 2005 discovery responses from the District of Columbia provided: "The following persons were present on April 20, 2002: (1) Then-Executive Assistant Police Chief Terrance Gainer, Metropolitan Police Department (2) Commander Mark Beach, Metropolitan Police Department (3) United States Secret Service,

- On February 15, 2006, faced with the District's admittedly deficient discovery responses, this Court ordered that the District produce supplemental interrogatory responses so that plaintiffs could have a full and accurate disclosure. See February 15, 2006 minute order.

- On March 9, 2006, the District supplemented its responses and continued to deny the presence of the FBI as well as the presence of MPD intelligence officers. The MPD identified one additional uniformed officer on the scene, Jeff Cadle, and represented that "Despite diligent efforts, the District has not been able to identify any other additional individuals responsive to this request."[5]

- On July 7, 2006, after another discovery conference, faced with the District's refusal to identify fully who was on the scene the Court *again* ordered the District to provide a complete and accurate response. This time, the Court, specifically required the District to secure all responsive information from "officials in the MPD's command structure (including the intelligence unit and all other relevant divisions or sections of the MPD)."[6]

- On August 22, 2006, the District provided its second supplemental response. While continuing to deny the presence of the FBI (and for that matter, Chief Ramsey, whose presence was also sought to be covered up), the MPD *"discovered" an additional twenty officers on the scene, including intelligence agents as well as the head of the MPD Intelligence Unit Jeffrey Madison* and a

---

Uniform Division, Sergeant Kuchinsky (4) United States Secret Service, Uniform Division, Caroline O'Brien (5) Lieutenant Lanciano, Metropolitan Police Department (6) Then-Commander Kim Dine, Metropolitan Police Department (7) Sergeant Forbes, Metropolitan Police Department (8) Sergeant Candace Neal, Metropolitan Police Department (9) Officer Andrea Latson, Metropolitan Police Department (10) Officer Adrian Sanders, Metropolitan Police Department (11) officer Wendy Payne, Metropolitan Police Department (12) Officer Michael Carruth, Metropolitan Police Department (13) Officer Arthur Brown, Metropolitan Police Department." See Ex. 7, Defendant District of Columbia's Responses to Plaintiffs' First Set of Interrogatories at 9.

The District's responses were sworn to be true, under penalty of perjury, by Commander Mark Beach.

[5] The supplemental response adds "In addition to the aforementioned, Officer Jeff Kadle, Metropolitan Police Department, apparently was at the scene of the arrest. He interviewed one or more of the witnesses, and prepared some of the arrest paperwork. Despite diligent efforts, the District has not been able to identify any other additional individuals responsive to this request." See Ex. 3, Defendant District of Columbia's Supplemental Responses to Plaintiffs' First Set of Interrogatories at 6. This supplement was sworn to be true, under penalty of perjury, by Jay Chisholm, Paralegal, Office of the Attorney General for DC.

[6] "[D]efendants shall, by no later than July 31, 2006, respond *in writing* to all written discovery requests for information regarding the identification of MPD or other law-enforcement officers who were present at the location where plaintiffs were arrested on April 20, 2002, and defendants shall make all reasonable efforts to identify such officers through, among other things, inquiries directed to those officers known to have been on the scene as well as inquiries directed to officials in the MPD's command structure (including the intelligence unit and all other relevant divisions or sections of the MPD) who would have knowledge about the identities of law-enforcement officers who were present." (docket entry no. 80).

videographer from the MPD's Electronic Surveillance Unit.[7]

- The MPD has not, to date, further supplemented its response to this interrogatory nor has it, despite all the evidence, admitted that they allowed the FBI onto the scene and allowed the FBI to engage in political interrogations of plaintiffs.

The District refused to produce documents including the Command Center running resume *of which the District has maintained possession since April, 2002* that confirm the presence of the FBI on the scene and the fact that the FBI was engaged in interrogations of activists:

- On December 11, 2003, the plaintiffs propounded an early documentary request for all records "relating to the arrests of plaintiffs at issue in this litigation regardless of whether such records or reports are categorized as arrest records, intelligence information or [by] any other nomenclature used by law enforcement." See Ex. 5, Plaintiffs' Limited Discovery to Defendants.

  No documents were produced in response. The OAG represented that, other than arrest records held by the D.C. Superior Court, no additional documents existed.

- On February 25, 2005, plaintiffs propounded additional requests for documents that, among other things, demanded production of:

  "All summaries, logs, running resumes, chronologies or other documents that reflect or document the activities of anarchists or persons perceived to be anarchists in connection with the April 20, 2002 protests.

  *By way of illustration and not of limitation this request is intended to encompass any "running resumes" or "categorizer" or "nest" reports, or logs produced by*

---

[7] The District now represented as follows: In addition to the persons identified in the District of Columbia's original response, the following persons (with their assignment at the time) were also present at the scene of the arrests: Officer Jeff Cadle, MPD, CDU 23; Sergeant Donald Yates (retired), MPD, Electronic Surveillance Unit; Officer Yudis Zuniga, MPD, CDU 23; Detective Carter Adams, MPD, Transport; Officer Dwayne Roberts, MPD, CDU 23; Officer Douglas Birk (deceased), MPD, CDU 23; Officer Roger Lowery, MPD, CDU 23; Sergeant Jeff Madison, MPD, Intelligence Unit; Detective Jonathan Pongratz, MPD, CDU 23; Officer Andres Marcucci, MPD, Intelligence Unit; Detective Matthew Davis, MPD, Intelligence Unit; Officer David Fore, MPD, Crime Scene Search (1D); Sergeant Jeffrey Tolliver, MPD, CDU 23; Officer James Culp, MPD, CDU 23; Officer Valerie Campbell, MPD, Crime Scene Search (3D); Sergeant Gregory Shamenek, MPD, Intelligence Unit; Officer William Belton, MPD, CDU 23; Detective Michael Murphy, MPD, Intelligence Unit; Officer Eric Cmeyla, MPD, CDU 23; Agent Stephanie Stradley, Secret Service". See Ex. 4, Defendant District of Columbia's Second Supplemental Responses to Plaintiffs' First Set of Interrogatories at 6 - 7.

This response was sworn, under penalty of perjury, to be true and complete by Jay Chisolm, Paralegal, Office of the Attorney General for the District of Columbia.

*an operations command center,* logs which reflect the movement of police or protestors, and any information feeds or outputs or recordings of such activities." (emphasis added). See Ex. 6, Plaintiff's First Set of Interrogatories and Request for Production to the District of Columbia at 10.

No documents or running resumes were provided in response to this request.

- On February 15, 2006, faced with the District's admittedly deficient discovery responses, this Court ordered that the District produce supplemental discovery production so that plaintiffs could have a full and accurate disclosure. See February 15, 2006 Minute Order.

- On March 31, 2006, the District provided supplementary responses that were executed by attorney James Vricos, Assistant Attorney General for D.C. In response to the demand for running resumes, Mr. Vricos represented as follows: "**[T]he District has no such documents in its custody or control.**" See Ex. 7, Defendants District of Columbia's Supplemental Responses to Plaintiffs' Second Request for Production of Documents and Things at 22 – 23.

- On July 11, 2006, faced again with deficient discovery responses from the District of Columbia, and plaintiffs' insistence that command center logs had to exist, the Court ordered that the MPD "provide any supplemental response to plaintiffs' request for production of MPD Command Center logs from April 20, 2002." (docket entry 80).

- On July 31, 2006, the District continued to deny the existence of command center logs. James Vricos filed a "supplemental" discovery response that provided, with regard to this issue, "Please see response to Request No. 22 in the District of Columbia's Supplemental Response to Plaintiff's Second Request for Production of Documents and Things." See Ex. 20, Defendant District of Columbia's Responses to Plaintiffs' First Set of Request for Production of Documents at 10.

  As above, in the referenced response Mr. Vricos represented that "**the District has no such documents in its custody or control.**"

Faced with a dearth of critical documents, plaintiffs have taken deposition after deposition of on-scene officers in an effort to get around the District's lie that it has no knowledge of FBI agents questioning plaintiffs.

What is astonishing is not the fact that a couple officers withheld this information, but that the scope of the cover up within the MPD is so extraordinarily broad.

Officer after officer, including the highest command officials, have testified under oath that he or she does not recall or does not know of the presence of the FBI at the scene, let alone questioning the arrestees.[8] All also indicate that it was not important or even noticed as to whether the arrestee group looked like or was characterized as anarchists. See, e.g., Ex. 19, Dep. of Beach at 135 ("I never described them as anarchists, but I will just describe them as persons, a bunch of persons).

Yet, the running resume states as its first relevant unredacted entry:

> 1712 hours: Intell 53 advised that appoximately [sic] five members of **the Anarchrist [sic] group** have entered a parking garage at 13th & L Street, N.W. Intell 30, Sgt. Shamenek responding to the scene also.

Only minutes later, the next entry provides:

> 1722 hours: **FBI, JOCC advises that an FBI Intell team is responding to area of 13th & K/L Streets regarding a report of alleged anarchists in the vicinity. There are reportedly 15 anarchists at 13th & K being interviewed**. The subjects reportedly had a passkey to a building, but it's unknown how they came to be in possession of it. MPD also on site.

See Ex. 8, Running Resume at 18.

The course of this litigation would have been substantially affected by the disclosure of the chronology and the contemporaneous record or admission that the FBI was engaged in political questioning.

---

[8] See Ex. 9, deposition excerpts: Dep. of Gainer at 28 (does not recall seeing FBI on the scene); Dep. of Ramsey at 76 (does not know if FBI was on the scene); Dep. of Beach at 74 (does not recall seeing FBI on the scene); Dep. of Yates at 48 (did not see anyone from FBI on the scene); Dep. of Marcucci at 32 (does not know if FBI was on the scene); Dep. of Shamenek at 55 (does not recall seeing FBI on the scene); Dep. of Brown at 48 (does not know if FBI was on the scene); Dep. of Neal at 50 (does not know if FBI was on the scene); Dep. of Fore at 45 (does not know if FBI was on the scene); Dep. of Davis at 46 (does not know if anyone was interrogated).

When asked why the District of Columbia and its legal representatives had either secreted or failed to produce (or acknowledge the existence of) the running resume, the Rule 30(b)(6) deponent could offer only one, resoundingly insufficient explanation: "Oversight."

This is not the only instance of discovery abuse and efforts to cover up the District and FBI's illegal actions. Officer Jeffrey Cadle is another central witness because he was the "scribe" assigned to take statements and contemporaneously make written record in his notebook of information related to the arrests and to material witnesses. His notes are clearly relevant in many ways. Jeffrey Cadle was conveniently omitted from the District's "disclosure" of persons physically present on the scene in their first response to interrogatories. His presence was acknowledged by the MPD only after plaintiffs' counsel in diligent investigation and review observed his name on paperwork that had been secured from the D.C. Superior Court. *His handwritten notes were not produced until July 31, 2006. Yet, Cadle testified in deposition in November, 2006 that he produced them to counsel "about a year and a half ago, about two years."* See Ex. 10, Cadle Dep. at 46. Not only did District of Columbia counsel know he was there, as well as his importance, but they had his notes, which they withheld.

To this moment, the District is refusing to produce an unredacted (or subject only to very limited redaction) copy of the running resume, in particular the intelligence section.

This lawsuit revolves around intelligence operations. Sergeant Michael Kuchinsky the ranking Secret Service agent who also asserts he first called in a report on the plaintiffs is a top official in Secret Service Intelligence. He called in the report of anarchists to his counterpart, Jeffrey Madison, the head of the MPD Intelligence Unit. Within minutes of this report, FBI Intelligence agents rushed to the scene to engage in videotaped political interrogations of the plaintiffs. Additional teams of intelligence agents from the MPD also came to the scene.

Yet, despite the centrality of intelligence officers in these events, the MPD has chosen to redact nearly all entries from the running resume that fall under the sub-heading of Intelligence.

Assistant Attorney General Carl Schifferle acknowledges that intelligence information relating to anarchists is under the redactions, but that counsel lacks the authority to reveal it.

The fact that the first and later references to plaintiffs is to "*the* anarchist group" suggests identification of, knowledge or, or surveillance of the plaintiffs that occurred prior in time to their (lawful) entry into the garage where their vehicles were parked. The intelligence information is most relevant to plaintiffs' claims of political profiling by intelligence and uniformed law enforcement officers.

While the District may attempt to object that the redacted information is subject to a law enforcement privilege, any objections to the production of this document have been waived by the failure to properly acknowledge the document's existence and by the consequential failure to timely object to its production.

Furthermore, the law enforcement privilege is not an absolute privilege, but is a qualified privilege. The interests are strong in disclosure particularly where there are allegations of abuse of law enforcement authority and where intelligence materials are relevant to claims of police misconduct.

Further, any claims by the District that running resumes are so secret or sensitive that they cannot be released to plaintiffs are belied by the fact that the District of Columbia outside of the context of litigation and without the force of the Federal Rules of Civil Procedure, has publicly released the running resumes *including the intelligence references* for other mass demonstrations. The District of Columbia has released each of the following running days of running resumes to the public: April 10, 11, 12, 14, 15, 16 and 17, 2000. See Ex. 11 – 17. The

attached running resumes reference April, 2000 International Monetary Fund / World Bank protest related intelligence reports as law enforcement surveilled the movements and activities of persons, particularly those dressed in black or perceived to be anarchists, to and throughout Washington, D.C. in connection with mass demonstrations. Running resumes, including entries from the intelligence "nest" or subcategory have been produced to undersigned counsel in the routine course of discovery in protest litigation. See, e.g., International Action Center, et al. v. United States of America, et al., Civil Action 01-CV-00072 (GK) (January 2001 Presidential Inauguration), Alliance for Global Justice, et al. v. District of Columbia, et al., Civil Action 01-00811 (PLF)(JMF) (April, 2000 IMF/WB protests and mass false arrest).

The District of Columbia has also failed to produce the recorded police channel communications from the day of the event. The MPD Operations Plan for the event establishes the use of the following channels for protest related police communication: Citywide, Command, Tact-1, Tact-2 and Special Operations Division, as well as the routine communications for the downtown 1D district.

The OAG previously represented to this Court in written filings that if those tapes could not be recovered, they would submit a written affidavit attesting to the circumstances, date and time and authority by which the tapes were destroyed. (Docket entry no. 71) ("The Defendants will produce recordings to which the Plaintiffs' [sic] are entitled if they are located or, if a determination is made that earlier recordings no longer exist, will produce a sworn statement regarding their destruction or unavailability.") They've never produced the recordings or the affidavit.

Plaintiffs observe that, if those tapes have been destroyed, the defendants must be subject to appropriate sanctions for evidence destruction under standard spoliation doctrine, and related

inquiry will be advanced in the Rule 30(b)(6) deposition of the District of Columbia. On the other hand, with judicial compulsion perhaps the District will suddenly be able to cause the tapes to become un-disappeared.

The District represents that it possesses even more documents that are responsive to plaintiffs' discovery requests. In the defendants' recent filing seeking a thirty day enlargement of discovery, Mr. Shifferle represented that "the District also anticipates producing additional documentation to plaintiffs in light of issues raised in the preparation and course of the Rule 30(b)(6) deposition." (docket entry no. 112). Yet those unknown documents have not been produced either.

The District of Columbia's conduct is completely at odds with and in violation of its obligations, both under the Federal Rules and this Court's discovery orders. They may not withhold documents until the last minute. Plaintiffs should not only be able to receive disclosure of discoverable materials if and only if they can locate a witness and elicit testimony that establishes that the District has been withholding them.

Furthermore, had plaintiffs not obtained counsel with significant and particularized expertise in police misconduct litigation in the context of mass demonstrations and who expended enormous efforts in pursuit of discovery, they might well never have discovered this critical evidence and cover-up. It would be completely reasonable for competent counsel to have accepted the District's sworn and repeated representations as true. This situation raises the question of in how many other matters the District and the MPD are withholding critical evidence.

The District's misconduct is patently prejudicial to plaintiffs, to the integrity of this judicial process, and to the interests of justice. Litigation cannot be properly conducted when the

rules of discovery are so flagrantly violated and when the representations of counsel are unreliable if not deceptive.

The plaintiffs in this case have come before this Court to seek redress and remedy of violations of their constitutional rights. They committed no crime. Their arrests were an outrageous abuse of police authority and a foul example of unlawful political profiling and lawless and out of control intelligence operations against anti-war activists. The MPD actually arrested all of the plaintiffs for the trumped up charge of "unlawful entry" into a parking garage to which they possessed a key. The MPD arrested plaintiffs despite the fact that their permission from a building employee and invitation to be present in the garage was unambiguously established. They engaged in a mass arrest where there was no evidence of unlawful entry, and where police took the statement[9] of the building employee who showed employee identification, presented a working key card for garage access, represented that he had accompanied plaintiffs when they entered to park their car, that he had invited them to park there, and that they were retrieving their vehicles inside the garage with his invitation and permission.

There was no lawful basis for arrest. Police may not arrest for "unlawful entry" everyone who has been invited into a garage to retrieve or get into a parked car. If this were the law then every time a person brought their spouse or children or friends into a garage to share a ride home after a day of sightseeing they would all subject to arrest for "unlawful entry." The only reason why the plaintiffs were arrested was because of their politics and appearance.

---

[9] The management of information deemed adverse by the MPD appears to have begun even from the moment of arrest. In Officer Cadle's scribe notebook, he identifies six persons as witnesses or law enforcement agents from whom he took information ostensibly in support of the false arrests. Cadle methodically transferred into arrest reports the identification of all those from whom he took statements or identified as witnesses, except for Jacob Leshner who is omitted. Leshner is, of course, the building employee who was with the arrestees and who presented building identification and told police they were on site with his permission and invitation. In deposition, Cadle said the omission was a "mistake." <u>See</u> Ex. 10, Dep. of Cadle at 106 – 109.

Plaintiffs have been deeply and personally affected because of these arrests. Yet, just as they were not in violation of the law on the day of their false arrests, they come before this Court exercising their right to a proper and judicial process to which they are constitutionally entitled.

The government, however, is just as lawless in this Court as it is on the streets when it challenges and falsely arrests those the police deem to be anarchists or anti-war activists or anti-globalization protestors.

Litigation is not supposed to be conducted like this. Months of depositions were taken without basic information. Opportunity for examination has been lost unless depositions are supplemented. Hours upon hours were expended planning and preparing and conducting discovery in a comprehensive and persistent effort to secure disclosure of information that was in the hands of the defendant the whole time, and then that information is received at the last minute and only in partial disclosure. There is a need for the Court to enforce its rules and to sanction this conduct to enforce the integrity of a judicial process in which all are vested.

Pursuant to Fed.R.Civ.P. 26, 33, 34 and 37, and this Court's discovery orders dated February 15, 2006 and July 7, 2006, the relief plaintiffs are requesting that the Court:

a. Order each attorney of record for the defense to submit an affidavit attesting to when he or she learned of the existence of the running resume, their knowledge as to the chain of custody and receipt of the copies of the running resume that Sgt. Jones sent to Legal both in December, 2003 and February, 2006, and cause to show why each should not be held in contempt for secreting or failing to disclose the running resume;[10]

---

[10] The attorneys that have entered their appearance in this case on behalf of defendants are as follows:

- Robert DeBerardinis, Jr. entered July 15, 2003 and withdrew February 1, 2006;

b. Compel production of the running resume with redactions limited to those consistent with the redactions in the already public running resume reports;

c. Compel production of the recorded police channel communications and, in the event they no longer exist, the production of an affidavit attesting to the date of destruction, the person authorizing destruction, the law or policy authorizing destruction, and all efforts by the District to preserve records related to this litigation upon notice of the claims;

d. Order production of an affidavit attesting to the date and efforts undertaken, and by whom, to search the collective knowledge of the District for the purposes of responding to plaintiffs' discovery requests, as well as attesting to the completeness and accuracy of the privilege log;[11]

e. Award attorneys fees and costs associated with the discovery litigation and hearings to date, including the advance of the instant motion;

f. Award attorneys fees and costs for any supplemental discovery or supplemental depositions that may be necessary as a result of late produced documentation; and

---

- Thomas Koger entered January 7, 2005 and withdrew January 4, 2006;
- Lori Parris entered March 17, 2005 and withdrew January 4, 2006;
- Caroline Mew entered December 22, 2005 and withdrew February 14, 2006;
- Julie Lee entered April 7, 2006 and withdrew July 25, 2006;
- Carl Schifferle entered February 1, 2006;
- Michael Bruckheim entered February 14, 2006;
- James Vricos entered February 28, 2006; and
- Holly Johnson (appeared in open court on discovery issues).

[11] The MPD's search of its collective knowledge is still not thorough. MPD Intelligence Unit head Jeffrey Madison, when asked on September 26, 2006 what efforts he had undertaken to secure information about the video interrogations replied "None." Referring to a photograph fortuitously located on the Internet of two of the interrogators, Madison explained "They didn't depict MPD personnel, so it is for the FBI to worry about, not us." See Ex. 18, Dep. of Madison at 43 – 44. Of course, Madison was at the scene and it is a fair inference that he has known all along about the interrogations.

g. Issue any other appropriate relief which the Court deems just and properly suited to the violations.

Respectfully submitted,

March 27, 2007

________________________________

Carl Messineo (# 450033)
Mara Verheyden-Hilliard (# 430031)
PARTNERSHIP FOR CIVIL JUSTICE, INC.
10 G Street, N.E., Ste 650
Washington, D.C. 20002
(202) 789-4330
(202) 789-4333 fax