## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ELIZABETH BOLGER, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No.  03-0906 (JDB)** |
| **DISTRICT OF COLUMBIA, et al.,** | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

This case arises out of the highly publicized arrests of a group of protesters at a

Washington, D.C. parking garage on April 20, 2002.  Eleven of the arrestees ("plaintiffs") filed

suit against the District of Columbia, various Washington, D.C. ("MPD") police officers, and

Robert S. Mueller, III, the Director of the Federal Bureau of Investigation ("FBI").  The case has

proceeded primarily against District of Columbia defendants, focused on the false-arrest claims.

As is relevant here, however, plaintiffs allege that two FBI agents on the scene interrogated them

about their political activities and affiliations, videotaped the interrogations, collected

information about plaintiffs, and used and disseminated that information improperly.  These

actions, plaintiffs assert, violated their rights under the First and Fourth Amendments, as well as

the Privacy Act, 5 U.S.C. § 552a (2007).  Defendant Mueller, who has been sued in his official

capacity, seeks dismissal of the claims against him, or in the alternative summary judgment on

those claims.  Plaintiffs oppose the motion and have countered with a motion pursuant to Fed. R.

Civ. P. 56(f).  For the reasons set forth below, the Court will grant defendant Mueller's motion

and deny plaintiff's Rule 56(f) motion.

## BACKGROUND

The facts, unless otherwise noted, are drawn from plaintiffs' Second Amended Complaint ("Second Am. Compl.").  On April 20, 2002, plaintiffs were among the thousands of protesters who participated in mass demonstrations during the spring meetings of the International Monetary Fund and the World Bank in Washington, D.C.  Second Am. Compl. at 5.  Plaintiffs were dressed in black, a color that law enforcement officials associate with supporters of Anarchism.  Id.  A member of plaintiffs' group had a key card that permitted weekend access to an indoor parking garage located at 1725 K Street, N.W.  Id. at 11 ¶ 28.  Plaintiffs entered the garage by swiping the key card and parked the van that they were using there.  Id. at 11-12 ¶¶ 29-30.  After the demonstration ended, plaintiffs returned to the garage to eat food that they had previously prepared.  Id. at 12 ¶ 31.

While plaintiffs were in the garage, law enforcement officers approached them with their weapons drawn.  Id. at 12 ¶ 35.  The officers ordered plaintiffs out of the garage, searched their persons and possessions, and searched the van without consent.  Id. at 12-13 ¶¶ 36-37.  In addition, the officers questioned plaintiffs about their political activities, reviewed flyers and political material, and recorded with video equipment images of political patches and slogans on plaintiffs' clothing.  Id. at 13 ¶¶ 38-39.  MPD officers arrested plaintiffs for unlawful entry.  But charges against plaintiffs were not pursued, and the D.C. Superior Court eventually ordered the expungement and sealing of their arrest records.  Id. at 6-9 ¶¶ 1-11.  Under Superior Court rules, the court's order required, among other things, that the prosecutor collect all law enforcement records in his possession and that he provide a certification that no further records exist "or that, if such records do exist, steps have been taken to retrieve them."  See D.C. SCR-Crim. Rule

118(f)(2)(A), (B).

Of particular relevance here is the role of the FBI.  Plaintiffs alleged in their original Complaint and have since reasserted that two FBI agents "pulled out selected detained protesters for the purposes of conducting on-camera video taped interviews."  Id. at 13 ¶ 41; Original Comp. at 13 ¶ 40.  These interviews allegedly centered on "political associations and activities" protected by the First Amendment.  Second Am. Compl. at 16-17 ¶ 57.  The Second Amended Complaint further avers that (1) the FBI collected information and created records as to all plaintiffs; (2) the information and records were maintained, used, and disseminated both inside and outside of the FBI; and (3) the information and records stigmatize plaintiffs by associating them with political beliefs and associations that law enforcement officials believe are indicative of criminal conduct.  Id. at 16-17 ¶¶ 56-63.  In so acting, plaintiffs maintain, the FBI violated their rights under the First and Fourth Amendments to the U.S. Constitution and the Privacy Act, 5 U.S.C. § 552a.[1]  Second Am. Compl. ¶ 74.  Plaintiffs seek a declaratory judgment to that effect, as well as an injunction "compelling the collection, provision to plaintiffs and expungement of" both the records "derived from" their arrests and the records that "describ[e]" their constitutionally protected activities.  Id. at 20 (e, f).

Defendant Mueller filed a motion to dismiss or in the alternative for summary judgment

---

[1] Plaintiffs do not specify in either their Second Amended Complaint or their subsequent briefs which provision or provisions of the Privacy Act they believe that the FBI has violated. The language of the Complaint, however, suggests that they are asserting violations of 5 U.S.C. §§ 552a(e)(6) and (e)(7).  Respectively, these two subsections govern dissemination of records outside of the agency and bar federal agencies from "maintain[ing any] record describing how any individual exercises rights guaranteed by the First Amendment . . . ."  These provisions are then enforceable under certain circumstances in a civil action pursuant to the Privacy Act's catchall provision for judicial review, 5 U.S.C. § 552a(g)(1)(D).

in November 2006.  Plaintiffs responded with an opposition and their counter-motion pursuant to

Fed. R. Civ. P. 56(f) two months later.  After briefing on these motions was ostensibly complete,

however, the protracted discovery efforts related to plaintiffs' claims against the District of

Columbia defendants yielded new information about the FBI's role in the events of April 20,

2002.  The so-called "running resume" -- a log of police activity from that evening -- confirmed

the FBI's involvement and provided a timeline for what transpired.  A prominent newspaper

reported on the transmittal of the log to the plaintiffs in this suit and commented on the law

enforcement action on its editorial page.  See Carol D. Leonnig, Police Log Confirms FBI Role

In Arrests; Group Detained, Questioned During D.C. War Protest, Wash. Post, April 3, 2007, at

B01; Editorial, A Black Mark, Wash. Post, April 11, 2007, at A14.

     In light of these developments, the Court provided defendant Mueller with an opportunity

to supplement the record and plaintiffs with a chance to respond.  Dkt. #115 (Order of

4/12/2007).  Defendant Mueller attached to his supplemental brief sworn declarations from two

FBI special agents who had questioned the group of plaintiffs on the night in question: Sean

McMenamin and Amy Landman.  Dkt. #120 (Def.'s First Supp. Mem.).  The FBI later agreed to

allow the two agents to appear for depositions and to give non-privileged and unclassified

testimony.  Dkt. #133 (6/5/2007 Motion).  These depositions took place in July 2007, and the

Court permitted the parties to file a second round of supplemental briefs and accompanying

materials to address the deposition testimony.  Dkt. #134 (6/12/2007 Status Report); Minute

Order of 7/12/2007.  This latest round of briefing having been received, defendant Mueller's

dispositive motion and plaintiffs' counter-motion are now ripe for resolution.

4

## STANDARD OF REVIEW

Defendant Mueller has moved to dismiss plaintiff's claims under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment. When, on a Rule 12(b)(6) motion, "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed. R. Civ. P. 12(b); see Yates v. District of Columbia, 324 F.3d 724, 725 (D.C. Cir. 2003) (per curiam). Here, the parties have presented, and the Court has considered, extensive materials beyond the pleadings.[2] In addition, both parties were given a reasonable opportunity to respond to the other's submissions. The Court will accordingly treat defendant's dispositive motion as one for summary judgment pursuant to Fed. R. Civ. P. 56(c).

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with

---

[2] The current record consists of the following briefs along with their accompanying exhibits: Defendant Mueller's Memorandum in Support of Motion to Dismiss/Summary Judgment ("Def.'s Mem."); Plaintiffs' Opposition to Defendant Mueller's Motion ("Pls.' Opp'n"); Defendant Mueller's Reply ("Def.'s Reply"); Defendant Mueller's First Supplemental Memorandum ("Def.'s First Supp. Mem."); Plaintiffs' First Supplemental Memorandum ("Pls.' First Supp. Mem."); Defendant Mueller's Second Supplemental Memorandum ("Def.'s Second Supp. Mem."); and Plaintiffs' Second Supplemental Memorandum ("Pls.' Second Supp. Mem.").

the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Fed. R. Civ. P. 56(c)).

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Id. at 252. By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. Celotex, 477 U.S. at 322. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted). Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

Plaintiffs seek an order under Rule 56(f) of the Federal Rules of Civil Procedure deferring defendant Mueller's motion for summary judgment and permitting additional discovery. Such an order is available where "it appear[s] from the affidavits of the party opposing the [summary judgment] motion that the party cannot . . . present by affidavit facts essential to justify the party's opposition." Fed. R. Civ. P. 56(f). The "party making a Rule 56(f) request must 'state[] concretely' why additional discovery is needed to oppose a motion for summary judgment." Messina v. Krakower, 439 F.3d 755, 762 (D.C. Cir. 2006) (citation omitted). A Rule 56(f) motion need not be granted "where the requesting party has offered only a 'conclusory assertion without any supporting facts' to justify the proposition that the discovery sought will produce the evidence required." Id. (citation omitted); see also Byrd v. EPA, 174 F.3d 239, 248 n.8 (D.C.

6

Cir. 1999) (plaintiff must "show what facts he intended to discover that would create a triable

issue and why he could not produce them in opposition to the motion").  But where the party

making the Rule 56(f) motion has not yet conducted any discovery, that party's Rule 56(f) motion

should normally be granted.  See Berkeley v. Home Ins. Co., 68 F.3d 1409, 1414 (D.C. Cir.

1995); Martin v. Malhoyt, 830 F.2d 237, 256 (D.C. Cir. 1987).

## DISCUSSION

### A.  Privacy Act

Defendant Mueller argues as a threshold matter that plaintiffs' claim under the Privacy

Act must be dismissed because (1) the Second Amended Complaint names an improper

defendant, and (2) the claim is untimely.  The first of these arguments is a highly technical one

that, even if meritorious, would likely lead first to an order dismissing the Privacy Act claim

without prejudice, and then to a Third Amended Complaint adding the FBI as a defendant.  See

Bavido v. Apfel, 215 F.3d 743, 747 & n.3 (7th Cir. 2000); Reyes v. Supervisor of the Drug

Enforcement Admin., 834 F.2d 1093, 1097 (1st Cir. 1987); Hewitt v. Grabicki, 794 F.2d 1373,

1377 (9th Cir. 1986).  In other words, the improper-defendant argument defers rather than

disposes of the Privacy Act claim.  Defendant's second argument presents close and contested

questions (a) as to when plaintiffs knew or should have known that FBI agents may have

collected and maintained records of the April 20, 2002 arrests and (b) as to whether, assuming

that the two-year limitations period expired before plaintiffs filed their Second Amended

Complaint, the limitations period should nonetheless be equitably tolled.  See Chung v. U.S.

Dep't of Justice, 333 F.3d 273, 277-78 (D.C. Cir. 2003); Tijerina v. Walters, 821 F.2d 789, 798

(D.C. Cir. 1987).  The Court's conclusion (explained in detail below) that plaintiffs are not

entitled to the requested declaratory and injunctive relief on any of their claims against the FBI obviates the need to resolve defendant Mueller's proper-party and timeliness arguments under the Privacy Act.

**B.  Availability of Declaratory and Injunctive Relief**

Plaintiffs seek declaratory and injunctive relief against the FBI for alleged violations of the Privacy Act and the First and Fourth Amendments.  Second Am. Compl. at 19 ¶ 74.  In addressing their claims, defendant Mueller first contends that plaintiffs' requests for relief are in the nature of mandamus and that plaintiffs must therefore meet a heavy burden to demonstrate entitlement to that extraordinary remedy.  Def.'s Mem. at 8-9.  Plaintiffs counter, and the Court agrees, that the Second Amended Complaint is best read as seeking a remedy directly under the Constitution.  See Pls.' Opp'n at 9.  The availability of such a remedy has been recognized by the D.C. Circuit and other courts.  See Hubbard v. EPA, 809 F.2d 1, 11 (D.C. Cir. 1986) (upholding the power of federal courts "to grant equitable relief to remedy agency violations of constitutional rights"); Spagnola v. Mathis, 859 F.2d 223, 229-230 (D.C. Cir. 1988) (en banc) (reaffirming this aspect of Hubbard); accord Mitchum v. Hurt, 73 F.3d 30, 34-35 (3d Cir. 1995) (Alito, J.).  Federal courts have subject-matter jurisdiction over suits seeking declaratory and injunctive relief because the APA waives the federal agency's sovereign immunity even when the claim is one directly under the Constitution and not under the APA.  See Trudeau v. FTC, 456 F.3d 178, 186 (D.C. Cir. 2006); Chamber of Commerce v. Reich, 74 F.3d 1322, 1328 (D.C. Cir. 1996).  Hence, the question here is not whether plaintiffs have satisfied the rigorous standard for issuance of a writ of mandamus, but instead (1) whether they can establish that the actions of the FBI violated the Constitution and the Privacy Act and, if so, (2) whether they can demonstrate an entitlement

8

to declaratory and/or injunctive relief.  The Court concludes that the standards governing this latter issue -- a party's entitlement to declaratory and injunctive relief -- control the resolution of defendant's motion.

To begin with, suits for declaratory or injunctive relief must present a live controversy justiciable under Article III of the Constitution.  See MedImmune, Inc. v. Genentech, Inc., 549 U.S. --, 127 S. Ct. 764, 771 (2007) (declaratory judgment); City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983) (injunctive relief).  An actual, justiciable controversy must exist not just at the moment that the suit is initiated, but also at the time that the party's entitlement to the requested relief is decided.  See Golden v. Zwickler, 394 U.S. 103, 108 (1969).  It is further settled in this regard that a past injury, without more, cannot form the basis for either injunctive or declaratory relief.  See O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."); Haase v. Sessions, 835 F.2d 902, 911 (D.C. Cir. 1987) (equating case-or-controversy requirement for declaratory judgment with one applicable to request for injunctive relief); see also Green v. Mansour, 474 U.S. 64, 74 (1985) (rejecting the view that "declaratory judgments expressly adjudicating the question of past violations are routinely available").  Hence, to obtain declaratory or injunctive "relief for past wrongs, a plaintiff must demonstrate either continuing harm or a real and immediate threat of repeated injury in the future."  Bauer v. Texas, 341 F.3d 352, 358 (5th Cir. 2003).  The D.C. Circuit has further clarified that a party pursuing an injunction or a declaratory judgment "must allege a likelihood of future violations of their rights by [the defendant], not simply future effects from past violations."  Fair Employment Council of Greater Washington, Inc. v. BMC Marketing

Corp., 28 F.3d 1268, 1273 (D.C. Cir. 1994).

Applying these principles, the Court concludes that plaintiffs are not entitled to the requested declaratory and injunctive relief.  With respect to the former, plaintiffs seek a declaratory judgment "that the collection, maintenance, use and dissemination of records describing each plaintiff's exercise of rights guaranteed by the First Amendment was in violation of the U.S. Constitution and the Privacy Act."  Second Am. Compl. at 20(e).  The requested relief amounts to a judicial declaration that the FBI previously engaged in unlawful conduct injurious to plaintiffs.  Plaintiffs also seek injunctive relief that is on the one hand broad in its scope (relief against all of the "ongoing unconstitutional and unlawful policies, practices and customs that caused the harm" of which they complain), and on the other more targeted.  Second Am. Compl. at 20(f).  This more targeted relief consists of an injunction compelling "the collection, provision to plaintiffs and expungement of" both any records derived from the allegedly unconstitutional arrests and any records "describing the First Amendment protected activities of plaintiffs."  Id.  The injunction, while targeted, would not be narrow; plaintiffs instead envision an order requiring the FBI not only to expunge any records improperly gathered or held, but also to track down and recover any records already disseminated.  See Pl.'s Opp'n at 10 & n.2.

Even assuming that plaintiffs' allegations are true and that the FBI in fact collected, maintained, used, and disseminated the records described, plaintiffs have established only that they were the victims of past wrongs.  As was explained above, plaintiffs cannot rely exclusively on "future effects from [these] past violations" of their rights as a basis for obtaining declaratory and injunctive relief.  See Fair Employment Council, 28 F.3d at 1273.  Rather, they can secure

declaratory and injunctive relief for their past injuries only by "demonstrat[ing] either continuing

harm or a real and immediate threat of repeated injury in the future."  See Bauer, 342 F.3d at 358;

see also Vanover v. Hantman, 77 F. Supp. 2d 91, 100 (D.D.C. 1999) ("[A] declaratory judgment

is appropriate to declare the rights between the parties only where there is 'a very significant

possibility of future harm; it is insufficient . . . to demonstrate only a past injury.'") (citation

omitted).  This they have not done.  Plaintiffs allege that their injury is past, present, "as well as

future," suggesting that the use and dissemination of the records continue to "subject[] those

arrested to risk of personal, professional, educational, financial, reputational and other forms of

irreparable and concrete harms."  Second Am. Compl. at 17 ¶¶ 62-63; Pls.' Opp'n at 14.

Assuming that records were created, the past injury is "plain enough"; it consists of harm that is

potentially economic and reputational in nature.  See Sullivan v. Murphy, 478 F.2d 938, 970

(D.C. Cir. 1973); Menard v. Mitchell, 430 F.2d 486, 490-91 (D.C. Cir. 1970).  But the risk of

continued harm or a repeated injury persists only if (and to the extent that) records of plaintiffs'

past activities and arrests currently exist.[3]  Put another way, the only thing that can cause

plaintiffs to suffer one of the present or future injuries enumerated above are records stating the

---

[3] This proposition is consistent with the cases holding that, at least with respect to certain violations of the Privacy Act, "a plaintiff may be entitled to have the offending records amended or expunged even if the records are not maintained within the agency's system of records."  See Clarkson v. IRS, 678 F.2d 1376-77 (11th Cir. 1982).  Critically, the agency in Clarkson admitted that it retained "surveillance reports and other documents" containing individual references to the plaintiff.  Id. at 1373.  There was thus no dispute as to the continued existence of the records. One judge even concurred separately to emphasize that the court's holding turned on the IRS's admission, and to caution that not "every plaintiff who alleges agency maintenance of first amendment material will be entitled to a judicially enforced scavenger hunt through that agency's records."  Id. at 1378-79 (Tjoflat, J., concurring).  Indeed, had it been shown either that the offending records never existed or that they were previously expunged, collected, and recalled, there would have been no need for the court to consider the options of amendment and expungement, and nothing for the IRS to amend or expunge.

fact of plaintiffs' arrests and/or the circumstances underlying those arrests.

Plaintiffs' speculation to the contrary notwithstanding, the unrebutted declarations in the summary judgment record confirm that the FBI has no such records at this time.  The first two declarations submitted by the FBI establish that no records chronicling plaintiffs' activities or arrests on April 20, 2002 are currently stored in three databases: the Fingerprint Identification Records System ("FIRS"), the National Crime Information Center ("NCIC"), and the FBI's Central Records System.  Del Greco Decl. ¶ 11; Turner Decl. ¶ 10.  That no such records currently exist would not surprise Special Agents McMenamin and Landman, who have averred that they turned over the lone videotape they took on April 20, 2002, along with "all of the notes that were taken during the interviews," to a uniformed MPD officer on the scene.  McMenamin Decl. ¶ 19; Landman Decl. ¶ 19.  Both agents have further sworn that they did "not prepare any documentation [on the interrogations] for the FBI or for inclusion in any FBI files or systems of records," and they are not aware of any of their FBI counterparts doing so.  McMenamin Decl. ¶¶ 23-24; Landman Decl. ¶¶ 23-24.  The declaration of former Special Agent McInerney, although less forthcoming, tells much the same story.  McInerney does not deny that plaintiffs were interrogated on tape, but disclaims having removed any videotape from the scene for placement in FBI files; having gathered any other information for inclusion in FBI files; or having created, opened, or maintained records on any of the arrestees.  McInerney Decl. ¶¶ 6-12.

Plaintiffs attack the sufficiency and veracity of these declarations in a variety of ways. Emphasizing first the careful and limited nature of the declarations, plaintiffs observe that the FBI has not averred that records of their arrests do not exist in <u>any</u> database, such as the "OneDOJ" system or the databases used by new "fusion centers" in which local law enforcement

agencies share intelligence with their federal counterparts.  Pls.' Opp'n at 3.[4]  They also point to

the FBI's refusal to comply with a February 2006 subpoena, and in particular to the responding

official's statement that he had reviewed plaintiffs' request "and determined that the FBI is not

authorized to produce the documents [plaintiffs] seek."  Pls.' Opp'n, Exh. 3 at 2; Pls.' Second

Supp. Mem. at 15.  In a similar vein, plaintiffs contend that the fact that records no longer exist

does not mean that such records never existed.  The gist of this argument is that, if records did

exist, any use or dissemination of those records served to let the cat out of the bag, thus raising a

risk of continued harm in the future.  Pls.' Opp'n at 5.

     None of these arguments demonstrates a likelihood of present or future harm sufficient to

justify declaratory or injunctive relief.  The first line of argument falters as a factual matter and is

highly speculative.  Specifically, one of the potentially inadmissible newspaper articles on which

plaintiffs rely reveals nothing about the record-keeping practices of the nascent fusion centers,

and the other article suggests that the information available via the OneDOJ system is already

contained in FBI files (and hence would be in one of the searchable databases in which the FBI

has looked).  Pls.' Opp'n, Exhs. 1, 2.  There is consequently no indication that the records search

conducted by the FBI left particular stones unturned or failed to account for locations in which

any records collected would likely be stored.

     Nor does the FBI's refusal to honor plaintiffs' subpoena constitute an admission -- explicit

---

[4] Plaintiffs base their references to the OneDOJ system and the fusion centers on two articles that appeared in the Washington Post in 2006.  Pls.' Opp'n, Exhs. 1, 2.  To the extent that plaintiffs rely on these articles for the truth of the assertions therein, the articles would constitute hearsay and hence be inadmissible in opposition to a motion for summary judgment.  See, e.g., Eisenstadt v. Centel Corp., 113 F.3d 738, 742 (7th Cir. 1997) (Posner, J.); Gonzalez v. City of New York, 354 F. Supp. 2d 327, 347 n.29 (S.D.N.Y. 2005).

or implicit -- that responsive documents or records existed at that time.  Plaintiffs pluck one

sentence out of a letter that lists any number of ways in which the subpoena request failed to

comply with the strict regulations that govern the FBI's production of documents.  Pls.' Opp'n,

Exh. 3 at 1-2 (explaining, among other problems, that the FBI was not properly served with the

subpoena and that the request did not comply with the applicable Touhy regulations).  The

strained inference that plaintiffs ask the Court to draw does them little good in any event because

it speaks to the existence of records at one time in the past, not to the continued presence in FBI

databases of records that could cause plaintiffs present or future harm.  Plaintiffs' repeated

reliance on the letter is an illustrative example of this misguided focus on the possible existence

of records at some point in the past.  As explained above, the existence of records at a discrete

moment in the past has little bearing on plaintiffs' entitlement to forms of relief that depend on

the likelihood that they will suffer present or future injury.  The expungement of plaintiffs' arrest

records ordered by the Superior Court appears to have rendered the risk of any such injury

negligible if not nonexistent.  After all, how can the FBI cause plaintiffs the feared "personal,"

"professional," or "reputational" injuries that may arise from being associated with Anarchism if

the FBI cannot locate any records of such an association?  See Second Am. Compl. at 17 ¶¶ 62-

63.  In the end, the absence of any records within the FBI's control means that the only present or

future harm that plaintiffs will suffer and that is traceable to the FBI's actions are the continuing

"emotional consequences" of the alleged intelligence-gathering efforts.  But this type of harm, the

Supreme Court has held, is an insufficient basis for injunctive -- and by extension, declaratory --

relief "absent a real and immediate threat of future injury by the defendant."  See Lyons, 461 U.S.

at 107 n.8.  Plaintiffs have not shown that there is any likelihood of such an injury.

14

In their supplemental filings, plaintiffs take a somewhat different tack, attempting to demonstrate that the FBI's sworn declarations are unworthy of credence and, relatedly, that factual disputes preclude a grant of summary judgment.  They point out, among other things, that information gleaned during discovery has called into question the belief that only two FBI agents participated in the interrogations, and instead suggests that as many as five agents were present.[5] Pls.' Second Supp. Mem. at 13.  These other agents might have been responsible for other videotaped interrogations, and hence could have created additional records of plaintiffs' protected activities.  Plaintiffs also challenge the assertion by Special Agents Landman and McMenamin that they took written notes and turned their notes over to an MPD officer.  Pls.' First Supp. Mem. at 6-7.  According to affidavits submitted by two of the plaintiffs, the agents took no such notes.  Id.  In addition, plaintiffs question the agents' statements that the audio function of the camcorder that they were using had been disabled and did not record sound during the interviews conducted.  It strains credulity, plaintiffs insist, that the FBI would dispatch agents to conduct counterintelligence and then have them record only the video component of question-and-answer interviews.  Id. at 2.

Although plaintiffs are correct that some of the facts surrounding these and other issues remain disputed, none of the factual disputes is material to deciding plaintiffs' entitlement to declaratory and injunctive relief.  Taking the examples listed above, the number of agents or teams present is relevant to the relief requested only in so far as those agents and teams generated records that can currently be expunged, collected, or recalled.  The sworn declarations provided

---

[5] Plaintiffs have not, however, sought to amend their complaint to revise their assertion that two FBI agents conducted the on-camera interviews.

by Special Agents McMenamin, Landman, and McInerney account for the record-keeping and record-creating activities -- or lack thereof -- of both teams.  Plaintiffs' focus on whether McMenamin and Landman took written notes is misguided.  Stated simply, if plaintiffs Spalt and DeRosa are correct and the agents did <u>not</u> take notes during the interviews, then there were fewer documents at risk of landing in agency files.  The dispute over the audio capabilities of the camcorder is similarly immaterial.  What matters with regard to the relief requested is whether the videotape currently exists, not whether the tape includes sound.  While doubts as to the tape's ultimate resting place are not definitively dispelled by the sworn declarations, the record evidence does establish that the FBI does not have the tape.  That fact <u>is</u> material, and plaintiffs' good-faith efforts to dispute it fall short.

Many if not all of those efforts stem from and reflect plaintiffs' evident distrust of the FBI.  Plaintiffs argue, not at all inaccurately, that the salient facts in this case have come to light only through their discovery efforts, and not because of voluntary disclosures by the FBI or the District of Columbia.  It is not surprising, therefore, that plaintiffs seek further discovery, a request that forms the basis for their counter-motion under Fed. R. Civ. P. 56(f).  In their initial motion, plaintiffs sought information regarding "the complete nature and extent of the maintenance, usage and dissemination of the video tapes and any derivative records," which information they expected to obtain via "interrogatories and requests for production," as well as depositions of, among others, "the plain clothed FBI agents who conducted the interrogations." Pls.' Opp'n at 15.  They have already gotten much of this in the form of sworn declarations from and depositions of Special Agents McMenamin and Landman; a declaration from former Special Agent McInerney was also provided in the latest round of supplemental filings, and plaintiffs are

16

scheduled to depose him this month.  Def.'s Second Supp. Mem. at 1 n.2; id., Exh. 6.  The

questions then become, what good would further discovery do, and what form would it take?

More discovery might shed further light on the events of April 20, 2002, providing details that

could be material to plaintiffs' claims against other defendants and would be material here if

plaintiffs were seeking even nominal damages against the FBI.  Cf. Utah Animal Rights

Coalition v. Salt Lake City Corp., 371 F.3d 1248, 1257 (10th Cir. 2004) (noting oddity of rule

that "a complaint for nominal damages could satisfy Article III's case or controversy

requirements, when a functionally identical claim for declaratory relief will not").  But such

discovery is unlikely to have any bearing on the propriety of injunctive and/or declaratory relief

related to records that, if they ever existed, no longer do.  Plaintiffs' desire for a full accounting of

what was done with any records that actually existed does not require the Court to permit

discovery that, to the extent it requires asking every FBI agent involved to certify that no records

were created, retained, or are still in existence, approximates the ultimate relief plaintiffs seek.

The Court will therefore exercise its discretion to deny plaintiffs' motion for discovery beyond

that which they have already conducted since filing their Rule 56(f) motion.

       In ruling that plaintiffs are not entitled to the declaratory and injunctive relief they seek,

the Court expresses no opinion as to whether the FBI violated either the Constitution or the

Privacy Act by participating in the pre-arrest interrogations of plaintiffs.  The Court is not,

however, oblivious to the serious questions plaintiffs have raised regarding the propriety and the

lawfulness of the FBI's actions during the events of April 20, 2002.  Indeed, the allegations in the

Second Amended Complaint, as fleshed out in the parties' supplemental filings, paint a picture of

potential governmental misconduct of constitutional dimension.  Moreover, it has taken four

years and often painful discovery efforts to fill in even the most basic aspects of this picture.

Nevertheless, neither the seriousness of the allegations nor the at times less-than-forthcoming

attitude of some governmental defendants compensates for plaintiffs' inability to demonstrate that

the FBI's alleged misconduct subjects them to the continued harm or threat of future injury that

must form the basis for declaratory or injunctive relief.  It is on this ground, then, that the Court

grants summary judgment in the FBI's favor.

## **CONCLUSION**

For the foregoing reasons, the Court grants defendant Mueller's motion for summary

judgment and denies plaintiffs' Rule 56(f) motion.  A separate order has been posted on this date.


               /s/ John D. Bates
                JOHN  D. BATES
            United States District Judge


Dated:   September 11, 2007