**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **ELIZABETH BOLGER, et al.,** |
| **Plaintiffs,** |
| **v.** |
| **DISTRICT OF COLUMBIA, et al.,** |
| **Defendants.** |

**Civil Action No.  03-0906 (JDB)**

**MEMORANDUM OPINION**

This matter is before the Court on plaintiffs' motion for sanctions and related relief for

discovery abuses perpetrated by the District of Columbia through its employees and attorneys.

Plaintiffs argue that the District violated two Orders of this Court in failing to produce responsive

documents in a timely manner.  The District admits that it has erred on several occasions

throughout the discovery process but argues that plaintiffs' requested relief is unwarranted.  Upon

careful consideration of the motion and the parties' memoranda, the applicable law, and the entire

record, the Court will grant in part and deny in part plaintiffs' motion.

**BACKGROUND**

For context, the Court provides a brief summary of the facts underlying this litigation, as

drawn from plaintiffs' Second Amended Complaint ("Second Am. Compl.").  On April 20, 2002,

plaintiffs were among the thousands of protesters who participated in mass demonstrations

during the spring meetings of the International Monetary Fund and the World Bank in

Washington, D.C.  Second Am. Compl. at 5.  Plaintiffs were dressed in black, a color that law

1

enforcement officials associate with supporters of Anarchism.  Id.  A member of plaintiffs' group had a key card that permitted weekend access to an indoor parking garage located at 1725 K Street, N.W.  Id. at 11 ¶ 28.  Plaintiffs entered the garage by swiping the key card and parked the van that they were using.  Id. at 11-12 ¶¶ 29-30.  After the demonstration ended, plaintiffs returned to the garage to eat food that they had previously prepared.  Id. at 12 ¶ 31.

While plaintiffs were in the garage, law enforcement officers approached them with their weapons drawn.  Id. at 12 ¶ 35.  The officers ordered plaintiffs out of the garage, searched their persons and possessions, and searched the van without consent.  Id. at 12-13 ¶¶ 36-37.  In addition, the officers questioned plaintiffs about their political activities, reviewed flyers and political material, and recorded with video equipment images of political patches and slogans on plaintiffs' clothing.  Id. at 13 ¶¶ 38-39.  MPD officers arrested plaintiffs for unlawful entry, but charges against plaintiffs were not pursued.  Thus, the D.C. Superior Court eventually ordered the expungement and sealing of plaintiffs' arrest records.  Id. at 6-9 ¶¶ 1-11.  On April 21, 2003, plaintiffs initiated this action alleging false arrest and imprisonment and civil conspiracy.

Plaintiffs now "move for discovery sanctions for the District of Columbia's flagrant abuse of the discovery process and failure to comply with this Court's discovery orders."  Pls.' Mot. at 1.  As an example, plaintiffs first point to the District's belated disclosure of the Command Center running resume -- a contemporaneous "narrative description in chronological order of all essential police operational activities, public events, and any other pertinent information related to the event for which activation of the [Command Information Center] occurred."  Pls.' Reply Ex. 1 at 82-83.  Because a Command Center was set up in anticipation of the April 2002 demonstrations, plaintiffs propounded an early document request in December 2003, which was

broad enough to encompass the running resume.  Plaintiffs requested "all documents, records and reports related to the arrests of plaintiffs at issue in this litigation regardless of whether such records or reports are categorized as arrest records, intelligence information or any other nomenclature used by law enforcement."  Pls.' Ex. 5 at 4.  The District failed to produce any such documents, claiming that the only responsive documents were the arrest records held by the D.C. Superior Court.

Plaintiffs then specifically requested production of the Command Center's April 20, 2002 running resume in their first set of requests for production.  Specifically, plaintiffs sought "all summaries, logs, running resumes, chronologies or other documents that reflect or document the activities of anarchists or persons perceived to be anarchists in connection with the April, 2002 protests."  Pls.' Ex. 6, Request No. 24.  Again, although plaintiffs insisted that running resumes were created for all mass demonstrations, the District failed to produce any running resumes in response to plaintiffs' request.

After plaintiffs initiated contact with this Court regarding the District's alleged failure to search for and produce responsive documents, the Court held a discovery conference on February 15, 2006.  On that same day, the Court ordered the District to "provide plaintiffs with supplemental responses to requests for production of documents and other materials by not later than March 31, 2006."  February 15, 2006 Minute Order.  On March 31, the District provided its supplementary responses to plaintiffs' request for running resumes, chronologies, or logs of the April 2002 events, stating that "the District has no such documents in its custody or control."  Pls.' Ex. 7 at 22-23.  In a letter attached to the production, the District's counsel stated as follows: "You are alerted that the production does not include running logs from the Command Centers

because no such documents were created during the April 2002 protest."  Pls.' Reply Ex. 3 at 1.

Plaintiffs continued to insist that a running resume was created and that the District was
not adequately searching its collective knowledge to answer plaintiffs' discovery requests.  The
Court then issued another order requiring the District to provide, by not later than July 31, 2006,
"any supplemental response to plaintiffs' request for production of [Metropolitan Police
Department] Command Center logs from April 20, 2002."  Docket No. 80.  In response, the
District continued to deny that any such running resume existed.  Pls.' Ex. 20 at 10.

After almost four years of litigation and three-and-a-half years of discovery, the District
changed its tune and finally produced a heavily redacted version of the April 20, 2002 running
resume.  Pls.' Mot. at 4.  The production was precipitated by an upcoming deposition of Sergeant
Douglas Jones ("Jones"), a deponent who would attest to the Command Center operations in
April 2002 and to whether a running resume was created.  On March 23, 2007, the business day
prior to that deposition -- and seven days before the then-scheduled close of discovery -- the
document was produced.  As plaintiffs rightfully point out, if they had not persisted in their
repeated efforts to obtain the running resume, the District may never have disclosed this
important document.

As another example of the District's improper conduct, plaintiffs point to the District's
belated disclosure of individuals who were on the scene in April 2002.  On May 6, 2005, the
District provided sworn discovery responses to plaintiffs' interrogatories and stated that the only
law enforcement officers on the scene were eleven uniformed MPD officers and two officers
from the United States Secret Service, Uniform Division.  Pls.' Ex. 7 at 9.  Following the
discovery conference with the Court, the Court's February 15, 2006 Order required the District to

produce supplementary responses to constitute a full and accurate disclosure.  Feb. 15, 2006

Minute Order.  On March 9, 2006, the District added Jeff Cadle ("Cadle") as an additional

uniformed officer on the scene, but indicated that no one else had been identified.  Pls.' Ex. 3 at

6.  Interestingly, Cadle was more than just another officer at the scene.  On the day of the protest,

he had been assigned to take statements and notes related to the arrests of plaintiffs.  Pls.' Mot. at

10.  Yet he was not identified and disclosed until almost a year after the District's initial

discovery response.  Plaintiffs contend that the addition of Cadle was again precipitated by their

own efforts when they saw his signature on relevant records at the D.C. Superior Court.  Pls.'

Reply at 14.  But while Cadle's notes were not produced until July 31, 2006, he stated in his

November 2006 deposition that he had produced his notes to District counsel "about a year and a

half ago, about two years" earlier.  Pls.' Ex. 10 at 46.

    Addressing plaintiffs' concern that the District was not being forthright about who was at

the scene, this Court's July 11, 2006 Order required as follows:

> defendants shall, by not later than July 31, 2006, respond in writing to all written
> discovery requests for information regarding the identification of [Metropolitan Police
> Department ("MPD")] or other law-enforcement officers who were present at the location
> where plaintiffs were arrested on April 20, 2002, and defendants shall make all
> reasonable efforts to identify such officers through, among other things, inquiries directed
> to those officers known to have been on the scene as well as inquiries directed to officials
> in the MPD's command structure (including the intelligence unit and all other relevant
> divisions or sections of the MPD) who would have knowledge about the identities of law-
> enforcement officers who were present.

Docket No. 80.  On August 22, 2006, the District once again denied the presence of any FBI

agents, but indicated that an additional twenty MPD officers were on the scene.  Pls.' Ex. 4 at 6-7.

When plaintiffs eventually obtained the running resume in March 2007, however, it clearly

demonstrated that the FBI had been involved on the scene of the April 20, 2002 events.

Plaintiffs argue that the above examples are just a few manifestations of the greater problem -- "the refusal of the District of Columbia to undertake a thorough search of its collective knowledge and records in response to discovery requests and also to be forthcoming in the production of the documents which it knows exists." Pls.' Reply at 1-2.  In light of these developments, plaintiffs are understandably upset by the District's repeated representations through counsel that its discovery responses were complete when additional information always seemed to come to light at a much later date.  Plaintiffs are particularly frustrated by the District's inaccurate representation that a running resume had never been created in April 2002.  Plaintiffs argue that the District's actions and the actions of its counsel can be seen as nothing other than an intentional "cover up of the involvement of the Federal Bureau of Investigation." Pls.' Mot. at 1. Plaintiffs complain that "[h]ours and hours were expended planning and preparing and conducting discovery in a comprehensive and persistent effort to secure disclosure of information that was in the hands of the defendant the whole time." Id. at 15.  Although plaintiffs' persistence paid off and they eventually obtained much of the information they sought, it was only after months of discovery, including numerous depositions, had already occurred.  Plaintiffs argue that this Court should sanction the District's "conduct to enforce the integrity of a judicial process in which all are vested." Id. at 15.

Plaintiffs specifically request that the Court: (1) order each attorney of record for the defense to submit an affidavit attesting to his or her knowledge of the running resume and to show cause why each should not be held in contempt for "secreting or failing to disclose the running resume," (2) order the production of an affidavit attesting to the events surrounding the destruction of recorded police channel communications, (3) order production of an affidavit

attesting to the date and efforts undertaken to search the collective knowledge of the District for

the purpose of responding to plaintiffs' discovery requests, (4) award attorney's fees and costs

associated with the discovery litigation and hearings to date, and (5) award attorney's fees and

costs for any supplemental discovery or depositions that may be necessary as a result of late

produced documentation.[1]

## LEGAL STANDARD

Plaintiffs seek sanctions pursuant to Fed. R. Civ. P. 37(b)(2).  "Under Rule 37, the district

court has broad discretion to impose sanctions for discovery violations."  <u>Bonds v. District of

Columbia</u>, 93 F.3d 801, 807 (D.C. Cir. 1996).  The Court may: (1) order that designated facts be

taken as established for the purposes of the action, (2) prohibit the introduction of certain

evidence, (3) strike pleadings, (4) stay further proceedings until the disobedient party obeys the

discovery order, (5) dismiss the action, (6) render a default judgment, or (7) treat the failure to

comply with the Court's order as contempt.  Because the sanctions listed above are not mutually

exclusive, the Court may impose any combination of sanctions.  Instead of or in addition to any

of the sanctions listed above, the Court may also order the offending party, or his attorney, or

both, "to pay the reasonable expenses, including attorney's fees, caused by the failure."  Rule

37(b)(2).  For whatever sanctions are prescribed, the Court must ensure that the order is just and

proportionate to the offense.  <u>See</u> <u>Bonds</u>, 93 F.3d at 808.

## DISCUSSION

Without a doubt, the salient facts in this case have often come to light only through

---

[1]Other elements of relief sought by plaintiffs are now moot following further late
disclosures by the District.

plaintiffs' persistent discovery efforts and this Court's orders, not through the forthright disclosure

of information by the District.  Nevertheless, the District asserts four reasons why the Court

should deny plaintiffs' motion for sanctions and related relief.  First, the District argues that the

motion should be denied "because it contains no certificate that plaintiffs' counsel conferred in

good faith with District counsel to secure the relief sought or to narrow the areas of

disagreement."  Pls.' Opp. at 17.  Next, the District argues that sanctions are unwarranted because

the delayed production of the running resume was "inadvertent."  Id. at 19.  The District also

argues that plaintiffs suffered no prejudice from the delayed production of the running resume.

And finally, the District argues that plaintiffs have no basis for requesting relief against counsel

from the Office of the Attorney General.  The Court will address each argument in turn.

## I.      Duty to Confer

Local Rule 7(m) requires a party to confer with opposing counsel prior to filing a

nondispositive motion with the Court to see if the areas of disagreement can be narrowed.  If a

party still intends to file the motion following the discussion, the party is to include a statement

indicating that the parties conferred and indicating whether the motion is opposed.  Because a

motion for sanctions is nondispositive, Local Rule 7(m) applies to plaintiffs' motion.  See U.S. ex

rel. Tenn. Valley Marble Holding Co. v. Grunley Const., 433 F. Supp. 2d 104, 111-112 (D.D.C.

2006) (citing Sokos v. Hilton Hotels Corp., 283 F. Supp. 2d 42 (D.D.C. 2003)).

Admittedly, plaintiffs' motion did not contain the requisite statement certifying that they

had conferred with the District's counsel.  However, the Court will not deny plaintiffs' motion

based upon this procedural deficiency.  The parties had ongoing discovery disputes for fourteen

months before plaintiffs filed their request for sanctions.  Pls.' Reply at 20.  Throughout that

period of time, the parties engaged in numerous discussions in an attempt to narrow the disputes.

The parties appeared for four discovery conferences with the Court on February 15, 2006; May 2,

2006; July 11, 2006; and September 13, 2006.  Id. at 21.  At the July 11, 2006 conference, the

Court explicitly warned the District that it would face sanctions if it failed to comply with the

Court's order to produce the requisite information by July 31, 2006.  Pls.' Reply Ex. 21 at 26.  Yet

despite this warning, the District did not comply.

On March 22, 2007, eight days before plaintiffs filed the motion for sanctions, plaintiffs

sent a letter to the District's counsel reiterating their concerns about the District's deficient

discovery responses and the failure to abide by its representations.   By this point in time the

District had produced a heavily redacted copy of the running resume, and plaintiffs were still

waiting for a copy that would be redacted in a more limited manner.  In the letter, plaintiffs

stated:

> This extremely late production of the command center log is of serious concern.  As you
> know, the Court has expended substantial time and resources, as have we, on the issue of
> the District's failures or refusals to provide complete discovery responses in accordance
> with applicable rules. . . . This again raises concerns about the quality of the District's
> production of documents to date and interrogatory responses.  The District represented
> previously that it would produce an affidavit attesting to the circumstances under which
> the radio runs, or recorded police channel communications, were lost or destroyed [yet it
> failed to do so]. . . . Furthermore, there is no need or basis for you to redact the running
> resume. . . .  With respect to all the issues above, including discovery related sanctions or
> motions, we reserve the right to seek whatever relief is appropriate from the Court.

Pls.' Reply Ex. 41 (emphasis added).  Plaintiffs attempted to contact the District again on March

26 and March 30, but the District never responded with any supplemental production.  Therefore,

after the close of business on March 30, plaintiffs filed their motion for sanctions.  Pls.' Reply at

25.

In light of the record in this case, the Court's warning regarding the possible imposition of sanctions, plaintiffs' correspondence with the District, and the District's failure to respond, the Court will not deny plaintiffs' motion based upon their failure to include the Local Rule 7(m) certification.  Indeed, it would be odd to foreclose the relief plaintiffs seek for countless serious discovery violations by the District based on the technical violation of Local Rule 7(m), behind which the District now seeks to hide.

## II.    The District's Belated Disclosure of the Running Resume

The District next argues that sanctions are unwarranted because the delayed production of the running resume was "inadvertent."  The facts before the Court, however, demonstrate that the imposition of sanctions is amply justified.  It is clear that the District not only <u>should</u> have known about the existence of the running resume, but individuals within the District <u>did know</u> about the running resume and had identified it as responsive to plaintiffs' discovery requests months before it was ever produced.

When the District was required to produce a deponent to attest to the Command Center's April 2002 operations and to whether a running resume was created, the District easily identified Sergeant Douglas Jones for the task.  At his deposition, Jones stated that he had sent the April 2002 running resume to his superiors not once, but <u>twice</u>, before in response to litigation requests.  Pls.' Reply Ex. 10.  Jones couldn't recall the date of when he first produced the running resume for his superiors, but he forwarded the running resume for the second time in February 2006 -- thirteen months before the District disclosed its existence to plaintiffs.  The District makes absolutely no attempt to explain how the running resume disappeared after Jones produced it the first time but attempts only to provide an explanation for why it was not produced

immediately after Jones retrieved it for the second time.

On February 13, 2006, Jones sent Deputy General Counsel for the Metropolitan Police Department Ronald Harris ("Harris") two e-mails in response to plaintiffs' discovery requests. Defs.' Ex. A ¶ 5.  The first e-mail had three attachments, and the second e-mail contained the same three attachments along with a fourth.  Id.  In his second e-mail, Jones stated "[a]ttached please find the requested ortho imagery, [Synchronized Operations Command Center] Reports and [Joint Operations Command Center] Activation Report."  Id.  Harris admits that he received and opened both e-mails from Jones.  However, he claims that he simply didn't realize that the document Jones called the "JOCC Activation Report" was the running resume from April 2002. Id.  Harris claims he didn't produce this document based on that misunderstanding, and he has "no recollection of having transmitted the document to the trial attorneys defending this matter." Id. ¶ 6.

The District's argument on this issue is unavailing.  Even if Harris did not immediately realize that the JOCC Activation Report was the long sought running resume due to a misunderstanding about the name, Harris certainly should have reviewed the document since Jones had identified it in response to plaintiffs' discovery requests.  Because plaintiffs had requested all "reports, or logs produced by a command center," even the title of JOCC Activation Report should have told Harris the document was responsive to plaintiffs' discovery demand. Thus, the report should, through the exercise of good faith reasonable diligence, have been produced to plaintiffs even if Harris did not immediately realize it was the running resume. Instead, plaintiffs did not receive the document until 13 months later, and only after they continued to fight to obtain it.

The District's other argument, that it was misled by one person's claim that running resumes were not created as early as April 2002, is equally unavailing. The District claims that at a meeting on May 31, 2006, Sergeant Nancy Cumberland advised counsel that the MPD did not create running resumes until September 2002. This alleged statement was made three years into the litigation, after plaintiffs' initial discovery requests had been made, and after the Court's February 15, 2006 Order. Because the District easily identified Jones as the Rule 30(b)(6) deponent, it could have and should have questioned Jones about this topic prior to relying on Cumberland's statement alone.

Additionally, plaintiffs have produced an overwhelming amount of evidence that demonstrates that the District should have been aware that running resumes were made as early as 2000. In fact, in response to an inquiry by the Council of the District of Columbia, Chief Charles Ramsey attested in a written deposition that running resumes were created for the April 2000 International Monetary Fund/World Bank protests, the Presidential Inauguration of 2001, and the September 2002 International Monetary Fund/World Bank protests instead of Commander's Mass Demonstration Event Logs. Pls.' Reply Ex. 6. Moreover, the MPD has previously declared running resumes from 2000 and 2001 in privilege logs in other mass protest litigation. Pls.' Reply Exs. 8 & 20. Thus, the Court is unmoved by the District's argument that sanctions are unwarranted due to the "inadvertence" of the belated disclosure. This is a clear case of sanctionable discovery misconduct, even if only the result of extreme negligence rather than bad faith or intentional misconduct.

### III.   Prejudice from the District's Discovery Violations

The District also argues that plaintiffs were in no way prejudiced by the discovery

violations and that sanctions should therefore not be imposed against the District.  This argument

is plainly without merit.  The running resume was created in April 2002, yet it was not produced

until March 2007 -- almost four years after the complaint was filed.  According to plaintiffs, the

"resume provides additional detail about the timeline, which is critical to establishing the time of

the arrest decision and the scope of information that was known at the time of arrest or

discovered thereafter while plaintiffs were still at the scene."  Pls.' Reply at 26.  As discovery

progressed, plaintiffs were deprived of the ability to examine witnesses at their depositions based

upon the contents of the running resume.  There is no reasonable question that the running

resume was likely to contain highly relevant evidence as to the April 20, 2002 events.

Moreover, plaintiffs devoted a considerable amount of time to obtaining this document,

even though the District insisted that no such running resume existed.  Numerous hearings were

held regarding the District's deficiencies in the discovery process, and numerous communications

were exchanged between the parties' counsel.  A consistent pattern was established, whereby

plaintiffs had to fight to obtain almost every relevant document.  The protracted discovery period,

the excessive amount of time plaintiffs had to devote to discovery disputes, the difficulty of

deposing witnesses without all relevant information, and the District's failure to be forthright all

clearly operated to the prejudice of plaintiffs.

IV.     **A Just and Proportionate Sanction**

Because the Court finds that the imposition of sanctions is clearly warranted, the final

task is to determine what sanction is just and proportionate to the discovery violations that were

undoubtedly committed.[2]  "Rule 37 provides that attorney's fees are appropriate where a party discloses discovery materials after a motion to compel is filed by the opposing party, or after the Court orders the party to do so."  Rude v. The Dancing Crab at Washington Harbour, LP, 245 F.R.D. 18, 23 (D.D.C. 2007).  The Court finds that considerable burdens and costs were incurred by plaintiffs in their persistent, but reasonable, discovery efforts to obtain the running resume, and that those efforts were necessitated by the discovery violations of the District and its attorneys.  Hence, the Court will grant plaintiffs' requested relief of attorney's fees and costs here.  The more difficult question involves plaintiffs' requested relief against the attorneys of record within the District of Columbia Office of the Attorney General.

"Under Rule 37, an attorney may only be sanctioned for personally violating a discovery order or for advising a client to do so."  Naviant Marketing Solutions, Inc. v. Larry Tucker, Inc., 339 F.3d 180, 185 (3d Cir. 2003).  As of now, plaintiffs' evidence falls short of this standard, because there is no firm evidence that any counsel of record intentionally violated or sought to violate a discovery order or obligation.  However, plaintiffs seek the means to investigate further and determine whether such a violation may have occurred here.  Thus, plaintiffs ask this Court

---

[2]Plaintiffs initially sought a number of affidavits to address their discovery concerns.  In response, the District proposed a reasonable alternative, which could proceed without court supervision or involvement.  The District proposed that Rule 30(b)(6) designees would be identified to discuss the radio recordings and other topics as desired by plaintiffs.  In their September 5, 2007 Joint Status Report, the parties represented that a Rule 30(b)(6) deposition had been conducted as to the status of the recorded police channel communications.  The Court is hopeful that the parties were similarly able to work in a collaborative fashion to resolve the other ongoing discovery issues at the root of plaintiffs' request for affidavits.  Docket Entry No. 142.

Because the destruction of the recorded police channel communications was confirmed months after the briefing was completed for plaintiffs' motion, however, the Court is not satisfied that it has sufficient information to resolve plaintiffs' request for sanctions on this issue.  Hence, the Court will seek short supplemental filings from the parties to clarify this request.

to order each attorney for the defense to submit an affidavit attesting to his or her knowledge of

the running resume and to show cause why he or she should not be held in contempt "for

secreting or failing to disclose the running resume." Pls.' Mot. at 15.  To ultimately prevail in a

contempt proceeding, plaintiffs would have to "prove the two elements of civil contempt -- the

existence of a clear and reasonably specific Order, and a violation of the Court's Order -- by clear

and convincing evidence." Stewart v. O'Neill, 225 F. Supp. 2d 6, 10 (D.D.C. 2002) (citing Food

Lion, Inc. v. United Food and Commercial Workers Int'l Union, 103 F.3d 1007, 1016 (D.C. Cir.

1997)).

In this matter, nine attorneys have entered an appearance on behalf of the District.  By

February 15, 2006 -- the date of the first Court order that was violated -- four defense attorneys

had already withdrawn their appearances.  As for the remaining five attorneys, who appeared at

various times since February 2006, the Office of the Attorney General has represented in its

filing that "[n]o [Office of the Attorney General] counsel learned of the existence of the running

resume until March 20, 2007, during a meeting between [Assistant Attorney Generals] Schifferle

and Vricos and Sergeant Jones." Defs.' Opp. at 21.  This representation indicates that the

affidavits requested by plaintiffs would amount to an unnecessary and unenlightening further

delay in this matter.  No doubt some sloppiness by some counsel might be revealed, or even a

failure by some counsel on some occasions to be fully diligent in discovery follow-up.  But even

that would probably not warrant personal sanctions against attorneys under the applicable legal

standards.

Without a doubt, there has been a lot of confusion in this case generated by the constant

rotation of defense counsel.  Although the Court does not condone the Office of the Attorney

General's handling of this matter, based upon the representations made in response to plaintiffs'

motion, and the care recently exhibited in the effort to understand past failings, the Court will not

issue the show cause order as requested by plaintiffs.  The Court finds that the imposition of

monetary sanctions on the District is just and proportionate to the discovery offenses that have

occurred without further redress individually against the defense attorneys of record from the

Office of the Attorney General.

### CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part plaintiffs' motion

for sanctions and related relief for discovery abuse perpetrated by the District of Columbia.

Because the record here clearly demonstrates that the District violated orders of this Court in

failing to produce responsive documents in a timely manner, the Court will grant plaintiffs'

requested relief of attorney's fees and costs.  By not later than April 21, 2008, plaintiffs shall

submit a detailed breakdown and explanation of the amount they seek.  A separate order

accompanies this memorandum opinion.


_____/s/_____
JOHN D. BATES
United States District Judge


Dated: <u>March 17, 2008</u>