**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ELIZABETH BOLGER, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No.  03-0906 (JDB)** |
| **DISTRICT OF COLUMBIA, et al.,** | |
| **Defendants.** | |

**MEMORANDUM OPINION**

Plaintiffs are eight individuals who were arrested for unlawful entry of a parking garage after attending the daylong protests on April 20, 2002 that coincided with the spring meetings of the World Bank and the International Monetary Fund in Washington, D.C.  Plaintiffs allege that their arrests violated the U.S. Constitution and D.C. common law, and they assert claims against both the District of Columbia (the "District") and various Washington, D.C. ("MPD") police officers.[1]  Currently before the Court are the parties' cross-motions for summary judgment. Plaintiffs have also requested sanctions against the District based on the destruction of recorded police radio communications sought during discovery.  For the reasons set forth below, the Court will deny plaintiffs' motion for summary judgment and will deny their request for sanctions without prejudice.  The Court will enter judgment in favor of defendants on those claims as to

---

[1] In their Second Amended Complaint, plaintiffs also asserted claims against former FBI Director Robert Mueller based on the FBI's alleged involvement in the arrests.  On September 11, 2007, the Court granted Director Mueller's motion for summary judgment on those claims. See Bolger v. District of Columbia, 510 F. Supp. 2d 86 (D.D.C. 2007).

which plaintiffs do not oppose dismissal,[2] but it will deny defendants' motion in all other respects

with the exception of qualified immunity for MPD Officers Michael Carruth, Andrea Latson and

Adrian Sanders, which will be granted.

## BACKGROUND

After nearly six years of litigation and an extremely contentious discovery process, many

facts in this case remain hotly contested.  What follows is a brief overview of the key events that

transpired on April 20, 2002.  Where facts are disputed, the Court has so noted.

A group of individuals, including plaintiffs, traveled from Baltimore to Washington, D.C.

on the morning of Saturday April 20, 2002 to attend the protests that were scheduled to coincide

with the spring meetings of the World Bank and the International Monetary Fund ("IMF").  See

Pls.' Stmt. of Facts As to Which There Exists a Genuine Issue to Litigate ("Pls.' Stmt.") ¶ 1.  One

member of the group, Jacob Leshner, worked as an information technologies specialist at the

Association for Professionals in Infection Control and Epidemiology ("APIC").  Id.  APIC's

offices are located at 1275 K Street, N.W., in downtown Washington, D.C.  As an APIC

employee, Leshner possessed an electronic keycard that granted him access to the building

garage on weekends.  Id.  Upon arrival at APIC's offices that day, Leshner used his electronic

keycard to open the garage door and the group -- traveling in two vans and one car -- parked in

the underground garage.  Id.  The group then exited the garage and spent the day participating in

---

[2] In their first opposition brief, plaintiffs state that they "are not opposing the dismissal of
the conspiracy count or the claims asserted against defendants Forbes, Micey [sic] and Brown."
Pls.' First Opp'n to Defs.' Mot. for Summ. J. ("Pls.' First Opp'n") at 1 n.1.  Accordingly, the Court
will enter judgment in favor of defendants on Count II (Civil Conspiracy) and it will also enter
judgment in favor of individual defendants Malcolm Forbes, Raymond Mincey and Arthur
Brown, and they will be dismissed from this action.

the protests.  Id.

As the protests were winding down, some members of the group told Leshner that they wished to return to the parking garage to eat food that had been left in one of the vans.  Id. ¶ 4. Because Leshner wanted to remain at the final rally site for another ten or twenty minutes to listen to a musical performance, he invited members of the group to return to the garage without him.  In order to allow them to enter the garage, Leshner gave his electronic keycard to Todd Spalt.  Id.  Among those who returned to the parking garage with Spalt were individuals dressed in all black attire and/or in possession of black bandanas, carrying protest signs bearing anti-war and anti-capitalist messages, wearing t-shirts with radical political slogans, and wearing items of clothing displaying the letter "A" surrounded by a circle, a recognized symbol for anarchism.  Id. ¶ 2.

The group led by Spalt arrived at the parking garage in two batches, with one arriving shortly after the other.  Id. ¶ 9.  They both claim that they utilized Leshner's keycard to gain entry to the garage.  Id. ¶¶ 10-11.  According to defendants, however, at approximately the same time, U.S. Secret Service Sergeant Mike Kuchinsky ("Sgt. Kuchinsky") observed a group of approximately twelve individuals standing near the entrance to an underground parking garage at 13th and K Streets, N.W.  See Defs.' Stmt. of Material Facts As To Which There Is No Genuine Dispute ("Defs.' Stmt.") ¶ 1.  Sgt. Kuchinsky noticed that some of these individuals had helmets, gas masks, or defense shields.  Id. ¶ 2.  As he was driving, Sgt. Kuchinsky observed a vehicle exiting the parking garage or a neighboring alley, and he also saw the garage gate begin to close. Id. ¶ 3.  He then says that he saw four to six individuals from the group diving or rolling under the garage gate just before it closed.  Id. ¶ 4.  At this point, Sgt. Kuchinsky says that he called

MPD to report what he had witnessed.  Id. ¶ 5.  MPD arrived at the scene soon thereafter.  Id. ¶ 6.

Meanwhile, shortly after the protestors returned to the van and began to eat, one group member, plaintiff Helen Johnson, walked to the top of the parking ramp to use her cell phone. Pls.' Stmt. ¶¶ 16-17.  At that time, Ms. Johnson encountered a law enforcement officer who was located on the other side of the grated metal garage door.  According to Ms. Johnson, the officer demanded to know who was in the garage and demanded to be let in.  Id. ¶ 17.  Once she explained that she could not let the officer into the garage because she did not have the electronic keycard, Ms. Johnson returned to the lower level of the garage to find Spalt and apprise him of the situation.  Id. ¶¶ 17-18.  Spalt, accompanied by at least one other member of the group, immediately walked up the ramp to speak to the officer.  Id. ¶¶ 18-19.  After Spalt explained that the group was gathered in the garage eating food, Sgt. Kuchinsky asked Spalt if he would open the garage door so that law enforcement could speak with the group further.  Id. ¶¶ 21, 23.  In response, Spalt passed the keycard through the metal grate of the gate so that the law enforcement personnel could enter.  Id. ¶ 24.

Plaintiffs assert that upon opening the garage door, a number of law enforcement officers charged down the ramp into the garage while yelling and shouting.  Id. ¶¶ 28-29.  Many of the individuals within the garage contend that, in response to the loud noises they heard coming down the ramp, they chose to exit the garage by using the stairwell.  Id. ¶ 29.  By contrast, defendants claim that upon reaching the group, one officer yelled "police" and most of the individuals then ran away.  Defs.' Stmt. ¶ 10.  The individuals who did exit the garage via the stairwell say that they walked briskly, but calmly, up the stairwell, through the lobby, and out

onto the street.  Pls.' Stmt. ¶ 34.  Once there, a number of these individuals encountered the

police, who detained them.  Id. ¶ 33; Defs.' Stmt. ¶¶ 13, 15.  Those individuals who remained in

the garage were escorted to the street level by MPD officers and detained.  Pls.' Stmt. ¶ 32; Defs.'

Stmt. ¶ 15.  A total of twenty-four individuals, including Spalt, were detained by MPD.  Defs.'

Stmt. ¶ 15; Pls.' Stmt. ¶ 28.  However, none of these individuals was arrested immediately.  Pls.'

Stmt. ¶¶ 38, 40.

Rather than arrest the group, the MPD commenced an investigation soon after the group

had been cleared out of the garage.  Around this time, Leshner also arrived at the scene.  Id. ¶ 46.

Leshner says that he was very vocal in his efforts to inform the authorities that he worked in the

building, that those individuals being detained had parked in the garage with him that morning,

and that because he was running a few minutes behind he had given his keycard to Spalt in order

to allow them access to the garage.  Id.  Leshner was left with the impression at the time that his

statements to law enforcement were generally disregarded.  Id. ¶ 47.  Contrary to this belief,

however, Leshner's pleas did not fall on deaf ears.  The record demonstrates that numerous law

enforcement personnel -- including Commander Mark Beach ("Cmdr. Beach"), the officer in

charge at the scene -- were aware at the time that the group possessed an electronic keycard that

was provided by a building employee (i.e., Leshner) and that the keycard was used to gain entry

to the garage.  See id. ¶ 50.

During the course of the investigation, John Johnson, a building security guard at 1275 K

Street, N.W., employed by Admiral Security, was interviewed by MPD.  Affidavit of John

Johnson ("Johnson Aff.") ¶ 2.  Johnson says that he "never told the police that the individuals

lacked authority to be on the premises."  Id. ¶ 3.  He also claims that when speaking to MPD at

the scene, he did not request that the protestors be arrested, nor did he believe that he had any reason to make such a request.  Deposition of John Johnson ("Johnson Dep.") at 10.  By contrast, MPD Officer Jeffrey Cadle, who interviewed Johnson at the scene, testified that Johnson told him that the individuals did not have authority to be on the premises.  Deposition of Jeffrey Cadle ("Cadle Dep.") at 49.  Officer Cadle's notes from the scene are consistent with his testimony.  Defs.' Ex. J (Cadle notes) ("Security Guard Johnson advises that they do not have authorization to be on premises.").

It is undisputed that during the course of MPD's investigation some effort was made to locate a representative of the building management company to ascertain whether the group had permission to use the parking garage.  The parties vehemently disagree whether such an individual was ever contacted.  Cmdr. Beach testified that he was informed that "a representative of property management requested their arrest and indicated that the representative from property management would be a complainant in the D.C. Superior Court for the prosecution of those persons for unlawfully entering."  Deposition of Mark Beach ("Beach Dep.") at 155; see also Beach's Responses to Pls.' First Set of Interrogs. ("Beach's Responses") at 6-7.  Cmdr. Beach did not speak to the representative directly; rather, he says this information was relayed to him by another law enforcement officer.  Beach's Responses at 6.  Cmdr. Beach does not recall the name of the officer who provided this information to him and the officer has never been identified.  Beach Dep. at 24-26.

The identity (as well as existence) of the building management representative also remains a mystery.  Cmdr. Beach admitted that he never knew the representative's name, even at the time, nor did he ever see the individual.  Id. at 23-24.  The representative's name was not

recorded at the scene by Officer Cadle along with the names of other witnesses.  See Defs.' Ex. J.

Nor was the name noted in the arrest documentation prepared several days later -- instead, "JBG

Company" was listed as the "complainant."  See Pls.' Opp'n, Ex. 59 (MPD supplement report).

MPD Sergeant Gregory Shamenek ("Sgt. Shamenek") testified that he recalled attempting to call

a contact number listed on the wall of the parking garage during the investigation, but that he

could not recall if those efforts were successful.  Deposition of Gregory Shamenek ("Shamenek

Dep.") at 39-41.  Efforts by the building management company, JBG Properties, to search its

records and identify such a person were also unsuccessful.  See Affidavit of JBG Props., Inc.

("JBG Props. Aff.").  Nonetheless, defendants contend that Sgt. Kuchinsky's testimony

corroborates Cmdr. Beach's story.  See Defs.' Reply to Pls.' Opp'ns to Mot. for Summ. J. ("Defs.'

Reply") at 9-10.  Sgt. Kuchinsky testified that he observed an individual having a conversation

with MPD officers, and he "would assume" that someone from MPD verified that this person

was a representative of the building management.  Deposition of Michael Kuchinsky

("Kuchinsky Dep.") at 125-26.  Sgt. Kuchinsky's testimony, however, offers nothing more

concrete than this assumption.  Based on the lack of corroborative evidence, plaintiffs assert that

Cmdr. Beach is lying.  See Pls.' First Opp'n at 2.  On plaintiffs' view of the facts, Cmdr. Beach

simply fabricated the building management representative in an attempt to manufacture probable

cause where none existed.  See id. at 2-3.

After investigating the circumstances surrounding the group's presence in the parking

garage for over an hour, Cmdr. Beach gave the order to arrest plaintiffs, along with the other

group members who were being detained, for unlawful entry.  See Pls.' Stmt. ¶¶ 40, 55.  While

the investigation was still ongoing, members of the MPD's Civil Disturbance Unit ("CDU")

arrived at the scene.  Defs.' Stmt. ¶ 17.  CDU was on duty that day in response to the World

Bank/IMF meeting and the related protests.  Id. ¶ 18.  The CDU squad members who arrived at

the scene included Officers Michael Carruth, Andrea Latson, Wendy Payne and Adrian Sanders.

Id. ¶ 19.  Acting pursuant to Cmdr. Beach's order, and at the direction of their commanding

officers, Officers Carruth, Latson, Payne and Sanders processed plaintiffs' arrests.  Id. ¶¶ 39-47.

After being transported from the scene to a MPD facility and there undergoing further

processing, plaintiffs were released that night with a citation that directed them to appear in court

on a future date to respond to the unlawful entry charges.  Id. ¶¶ 53-54.  Before their court date,

however, the U.S. Attorney's Office made the determination not to prosecute and entered a nolle

prosequi on all charges.  Id. ¶ 55.

> This action was initiated in 2003.[3]  After several amendments to the complaint, the
gravamen of plaintiffs' case remains the same -- plaintiffs believe that they were targeted
improperly by law enforcement because they were perceived to be anarchists and, consequently,
they were arrested without probable cause for exercising their constitutionally protected rights to
free speech and free association during the World Bank/IMF protests.  Based on this premise,
plaintiffs assert claims against the District and the individual MPD officers involved in their
arrests pursuant to 42 U.S.C. § 1983 ("section 1983"), contending that their arrests violated both
the First and Fourth Amendments and deprived them of due process of law.  See Second Am.
Compl. ¶¶ 65-66.  Plaintiffs also assert claims for false arrest and imprisonment under D.C.
common law against all defendants with the exception of Cmdr. Beach.  Id. ¶ 67.

---

[3] Three of the original plaintiffs in this case -- Nicole Davis, Todd Spalt and Jennifer
Zimmerman -- settled their claims in early 2006 and are no longer a part of this litigation.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion by identifying those portions of "the pleadings, the discovery and disclosure materials on file, and any affidavits" that it believes demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c); see Celotex, 477 U.S. at 323.

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Id. at 252. By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. Celotex, 477 U.S. at 322. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted). Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

## ANALYSIS

### I.   Probable Cause to Arrest Plaintiffs for Unlawful Entry

In Count I, plaintiffs raise claims alleging that they were falsely arrested and imprisoned

in violation of the First and Fourth Amendments and D.C. common law.[4]  Second Am. Compl. ¶ 65.  Both parties agree that because the arrests at issue here were made without a warrant, the presence or absence of probable cause to arrest plaintiffs is essential to resolving Count I.  See Pls.' Am. Mot. for Summ. J. ("Pls.' Am. Mot.") at 7-13; Defs.' Mot. for Summ. J. ("Defs.' Mot.") at 6-14; see also Wardlaw v. Pickett, 1 F.3d 1297, 1304 (D.C. Cir. 1993) ("Where, as here, a false arrest claim is based on a warrantless arrest, the defendant officers must establish probable cause to arrest.").  Although the Court agrees with the parties, it cannot, based on the present record, determine as a matter of law whether there was probable cause in this case because there is a genuine issue of material fact whether a representative of the building management ever informed law enforcement that plaintiffs were not authorized to be in the parking garage.  Without resolving that fact -- which is unmistakably a task for the jury, especially because Cmdr. Beach's credibility is at issue -- the Court cannot determine as a matter of law whether there was probable cause to arrest plaintiffs for unlawful entry.  Consequently, summary judgment on this issue is precluded for both parties, and none of the claims encompassed by Count I can be resolved at this time.

"The elements of a constitutional claim for false arrest are substantially identical to the elements of a common-law false arrest claim."  Scott v. District of Columbia, 101 F.3d 748, 753

---

[4] Plaintiffs also allege that defendants' actions deprived them of "due process under the law."  Second Am. Compl. ¶ 65.  Plaintiffs, however, make no reference to the Fifth or Fourteenth Amendments in their pleadings.  The Supreme Court has observed that "[t]he Fourth Amendment was tailored explicitly for the criminal justice system, and its balance between individual and public interests always has been thought to define the 'process that is due' for seizures of persons or property in criminal cases."  Gerstein v. Pugh, 420 U.S. 103, 125 n.27 (1975).  Therefore, and to the extent plaintiffs intended to plead another independent basis for relief under section 1983, the Court will regard plaintiffs' due process-based claim as merged with their Fourth Amendment claim.

(D.C. Cir. 1997).  In resolving a claim for false arrest, whether raised pursuant to section 1983 or

D.C. common law, the central inquiry is identical:  was the arresting officer justified in ordering

the arrest of the plaintiff?  See Dellums v. Powell, 566 F.2d 167, 175 (D.C. Cir. 1977).  If the

arrest was justified then "the conduct of the arresting officer is privileged and the action fails."

Id.  Because "[j]ustification can be established by showing that there was probable cause for

arrest of the plaintiff on the grounds charged," id., "[m]ost false arrest claims turn on the issue of

whether the arresting officer had probable cause," Scott, 101 F.3d at 754.

"It is well settled that an arrest without probable cause violates the fourth amendment."

Martin v. Malhoyt, 830 F.2d 237, 262 (D.C. Cir. 1987) (citing Gerstein, 420 U.S. at 111).

Probable cause is determined on the basis of the "totality of the circumstances," see Illinois v.

Gates, 462 U.S. 213, 230 (1983), which requires that "the police had enough information to

warrant a man of reasonable caution in the belief that a crime has been committed and that the

person arrested has committed it," Barham v. Ramsey, 434 F.3d 565, 572 (D.C. Cir. 2006)

(internal quotations omitted); see Gerstein, 420 U.S. at 111 (probable cause to arrest exists when

the facts and circumstances are sufficient to warrant a prudent person to believe that the

individual has committed an offense).

Here, plaintiffs were arrested and charged with unlawful entry.  In pertinent part, D.C.

Code § 22-3302 defines the offense of unlawful entry as follows:

> Any person who, without lawful authority, shall enter, or attempt to enter, any
> public or private dwelling, building, or other property, or part of such dwelling,
> building, or other property, against the will of the lawful occupant or of the
> person lawfully in charge thereof . . . shall be deemed guilty of a misdemeanor,
> and on conviction thereof shall be punished by a fine not exceeding $100 or

imprisonment in the Jail for not more than 6 months, or both.[5]

To prosecute this type of unlawful entry offense,[6] the government must prove that the accused: (1) entered or attempted to enter public or private premises or property; (2) did so without lawful authority; (3) did so against the express will of the lawful occupant or owner; and (4) had general intent to enter.  Culp v. United States, 486 A.2d 1174, 1176 (D.C. 1985).  Therefore, to have probable cause to arrest an individual for an unlawful entry of this sort an officer must have "enough information to warrant a man of reasonable caution in the belief" that all four of these elements are present.  Barham, 434 F.3d at 572.

Plaintiffs do not dispute that the first two elements were present when they entered the parking garage at 1275 K Street, N.W., in the early evening of April 20, 2002.  Pls.' Am. Mot. at 8.  The primary dispute concerns the third element -- whether plaintiffs entered the parking garage "against the will of the lawful occupant or of the person lawfully in charge thereof."  D.C. Code § 22-3302.  On this issue, the parties have wildly divergent views of the facts.  Without resolution of this core factual dispute, the Court cannot determine as a matter of law whether there was probable cause to arrest plaintiffs for unlawful entry.

In defendants' view, plaintiffs were not authorized to be in the parking garage because, inter alia, the police confirmed with persons in charge of the building that the group did not have

---

[5] Since the time of plaintiffs' arrests on April 20, 2002, the statutory definition of unlawful entry has been amended, see D.C. Law 16-302, § 219, 53 DCR 8610 (Apr. 24, 2007), but the relevant portion of the offense quoted above has not been altered.

[6] A person may also be guilty of unlawful entry if he or she "refuse[s] to quit [any public or private dwelling, building, or other property, or part of such dwelling, building, or other property] on the demand of the lawful occupant, or of the person lawfully in charge thereof." D.C. Code § 22-3302.  Because no such demand or refusal was made in this case, this type of offense is not at issue.

permission to be on the premises.[7]  See Defs.' Mot. at 11-14; Defs.' Reply at 9-10.  Defendants

first point to Officer Cadle's testimony regarding his conversation with security guard Johnson,

whom he interviewed at the scene.  Officer Cadle testified that Johnson told him that the

individuals did not have authority to be on the premises.  Cadle Dep. at 49.  His notes from the

scene are consistent with his testimony.  Defs.' Ex. J ("Security Guard Johnson advises that they

do not have authorization to be on premises.").[8]  As further evidence, defendants also highlight

Cmdr. Beach's testimony.  He testified that he was informed by another member of law

enforcement that "a representative of property management requested their arrest and indicated

that the representative from property management would be a complainant in the D.C. Superior

Court for the prosecution of those persons for unlawfully entering."  Beach Dep. at 155; see also

Beach's Responses at 6-7.  Lastly, defendants contend that Sgt. Kuchinsky's testimony

---

[7] Defendants cite several other factors that purportedly informed the probable cause determination.  See Defs.' Mot. at 8-11.  However, it was only after law enforcement allegedly received the information that a representative of the building management was willing to be a complainant that the decision to arrest was actually made.  Cmdr. Beach -- the officer who gave the order to arrest -- testified that it was this information that established probable cause to order the arrests.  See Beach Dep. at 28-29.  The Court agrees that this appears to be the dispositive fact in the probable cause determination here.  In any event, there are also genuine issues regarding the facts underlying defendants' other asserted bases for probable cause.  See Pls.' First Opp'n at 9-26.

[8] Plaintiffs suggest that Officer Cadle's testimony and his notes regarding his conversation with Johnson are entitled to no weight on summary judgment because both pieces of evidence are inadmissible hearsay.  See Pls.' First Opp'n at 32; see also Greer v. Paulson, 505 F.3d 1306, 1315 (D.C. Cir. 2007) ("sheer hearsay . . . counts for nothing on summary judgment") (internal quotations omitted).  The Court disagrees.  Johnson's out-of-court statement is not being offered for the truth of the matter asserted (i.e., the group's lack of authority to be on the premises); rather, it is being offered to show that Johnson made such a statement at the scene to Officer Cadle and that the substance of his statement was known to Cadle (and thereby MPD) at the time.  Consequently, this evidence is not hearsay in this context and the Court can properly consider it in resolving summary judgment.

corroborates Beach's story because Kuchinsky says that he observed an individual having a conversation with MPD officers, and he "would assume" that someone from MPD verified that this person was a representative of the building management.  Kuchinsky Dep. at 125-26; see also Defs.' Reply at 9-10.

Plaintiffs offer a starkly different view of the evidence.  To begin with, they contend that the undisputed evidence demonstrates that law enforcement knew at the time that plaintiffs' entry into the parking garage was invited by a building employee (Leshner), was effectuated by use of an electronic keycard, and was therefore with permission and was not against the will of the lawful owner or person in charge.  See Pls.' First Opp'n at 1; Pls.' Stmt. ¶ 50.  Because defendants possessed such knowledge, plaintiffs argue that it is reasonable to infer that the communications with the building management representative were fabricated in order to create the appearance that the group's presence was unauthorized.  To support their claim, they attack Cmdr. Beach's credibility and assert that "[a]side from Beach's bare assertion, there is no evidence that any officer reported to Beach that there was such a [building management] representative."  Pls.' First Opp'n at 2.  Plaintiffs point out that Cmdr. Beach has never claimed to have spoken directly to the representative; rather, he says the information from the representative was relayed to him by another law enforcement officer.  See Pls.' First Opp'n at 29-30; Beach's Responses at 6.  At his deposition Cmdr. Beach could not identify the officer who provided this information to him.  Beach Dep. at 24-26.  Moreover, the record does not contain any evidence of this unknown officer's identity.  Cmdr. Beach also admitted that he never knew the building representative's name, even at the time, nor did he ever see the individual.  Id. at 23-24.

Plaintiffs assert that beyond Cmdr. Beach's "unsubstantiated claim, there is no evidence at all" to support the conclusion that a building management representative spoke to law enforcement. Pls.' First Opp'n at 29. The representative's name was not recorded at the scene by Officer Cadle along with the names of other witnesses. See Defs.' Ex. J. Law enforcement also failed to note the name in the arrest documentation prepared several days later -- instead, "JBG Company" was listed as the "complainant." See Pls.' Opp'n, Ex. 59. Sgt. Shamenek testified that he recalled attempting to call a contact number listed on the wall of the parking garage during the investigation, but that he could not recall if those efforts were successful. Shamenek Dep. at 39-41. Efforts by the building management company, JBG Properties, to search its records and identify such a person were also unsuccessful. See JBG Props. Aff. This evidence, plaintiffs argue, leads to the conclusion that the building management representative described by Cmdr. Beach "is wholly fictional." Pls.' First Opp'n at 28.

Plaintiffs also note that security guard Johnson's own testimony and his sworn affidavit directly conflict with Officer Cadle's account of their interaction. See Pls.' Reply in Supp. of Am. Mot. for Summ J. ("Pls.' Reply") at 9-10. Johnson says that he "never told the police that the individuals lacked authority to be on the premises." Johnson Aff. ¶ 3. He also testified that when speaking to MPD at the scene, he did not request that the protestors be arrested, nor did he believe that he had any reason to make such a request. Johnson Dep. at 10.

The Supreme Court has consistently emphasized that "at the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. Likewise, the Supreme Court has cautioned that "[c]redibility determinations, the weighing of the evidence,

and the drawing of legitimate inferences from the facts, are jury functions, not those of a judge"
resolving a motion for summary judgment.  Id. at 255.

Based on the foregoing, the Court concludes that summary judgment on the issue of
probable cause is precluded for both parties because there is a genuine issue of material fact
whether a representative of the building management ever informed law enforcement that
plaintiffs were not authorized to be in the parking garage.  This factual dispute, which goes to the
heart of the central element of the unlawful entry offense, makes it impossible to evaluate the
totality of the circumstances at the time of the arrests, see Gates, 462 U.S. at 230, and therefore
the Court cannot determine as a matter of law whether Cmdr. Beach and the other officers had
probable cause to arrest plaintiffs.  The jury will ultimately have to resolve this dispute.

## II.      Qualified Immunity and Common Law Privilege

Irrespective of probable cause, the remaining individual defendants -- Cmdr. Beach and
Officers Carruth, Latson, Payne and Sanders (the "arresting officers") -- argue that they are
entitled to qualified immunity from suit under section 1983.  See Defs.' Mot. at 15-20.  The
arresting officers also assert that under D.C. law they are entitled to common law privilege,
which would immunize them from suit on plaintiffs' common law false arrest claims as well.  Id.
at 20.  In response, plaintiffs contend that the individual defendants are not entitled to qualified
immunity or common law privilege because their actions were not reasonable under the
circumstances.  See Pls.' First Opp'n at 33-37; Pls.' Second Opp'n to Defs.' Mot. for Summ. J.
("Pls.' Second Opp'n").

Both parties acknowledge that for purposes of the qualified immunity analysis, Cmdr.
Beach, as the commanding officer who ordered the arrests, is situated differently than the

officers who carried out the arrests at the direction of their superiors.  For essentially the same reasons discussed above, the Court must deny Cmdr. Beach's qualified immunity claim at this time because there is a genuine issue of material fact regarding the existence of the building management representative, and the reasonableness of Beach's conduct cannot be assessed without first resolving that issue.  On the other hand, the qualified immunity claims of the four arresting officers are, for the most part, untainted by this factual dispute.  For that reason, the Court can resolve those qualified immunity claims as a matter of law.  Based on the undisputed record evidence currently before the Court, the qualified immunity claims of Officers Carruth, Latson and Sanders will be granted.  However, given certain factual circumstances that are unique to her case, Officer Payne's qualified immunity claim must be denied at this time.

Police officers enjoy a qualified immunity from suits alleging violations of constitutional rights.  See Saucier v. Katz, 533 U.S. 194, 200 (2001).  The Supreme Court has made it clear that there are two inquiries involved in the qualified immunity analysis.  The first question is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Id. at 201.  If the court determines that there is no such violation, the analysis is over and the officer is entitled to qualified immunity.  If, however, there is a constitutional violation, the second step in the analysis is to determine "whether the right was clearly established."  Id.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Id. at 202.  When conducting the second step of the inquiry, it "must be undertaken in light of the specific context of the case, not as a broad general proposition."  Id. at 201; see Wilson v. Layne, 526 U.S. 603,

615 (1999) ("the right allegedly violated must be defined at the appropriate level of specificity

before a court can determine if it was clearly established").

The Supreme Court's recent decision in <u>Pearson v. Callahan</u>, 129 S. Ct. 808 (2009), has

altered the qualified immunity analysis somewhat by revisiting the sequence of the two-part

inquiry set forth in <u>Saucier</u>.  In <u>Pearson</u>, the Supreme Court wrote:

> On reconsidering the procedure required in <u>Saucier</u>, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.  The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.

129 S. Ct at 818.  In granting courts greater discretion to conduct the qualified immunity

analysis, <u>Pearson</u> also noted that "we continue to recognize that [the <u>Saucier</u> protocol] is often

beneficial."  <u>Id.</u>

The newfound flexibility that <u>Pearson</u> affords is of little import in this case because, on

plaintiffs' version of the facts, there is no question that they have alleged a constitutional

violation against the individual officers for either ordering (Cmdr. Beach) or carrying out

(Officers Carruth, Latson, Payne and Sanders) plaintiffs' arrests without probable cause in

violation of the Fourth Amendment and in retaliation for the exercise of protected First

Amendment rights.  Accordingly, the second part of the qualified immunity inquiry will be the

Court's focus here.

## A.      Commander Beach

Cmdr. Beach's qualified immunity claim must be denied at this time due to the genuine

issue of material fact regarding the existence of the building management representative.  Until

the jury resolves this underlying factual dispute, the Court cannot determine as a matter of law

whether Cmdr. Beach's conduct in ordering plaintiffs' arrests was objectively reasonable under the second step of the qualified immunity analysis.  See Saucier, 533 U.S. at 201-02.  As this Court has recognized, "[o]nce a genuine issue of material fact is found to exist, the defense of qualified immunity shielding the defendant from trial must be denied. . . .  [W]here there are issues of material fact surrounding [the conduct of either an arrestee or an arresting officer] it is impossible for the court to determine, as a matter of law, what predicate facts exist to decide whether or not the officer's conduct clearly violated established law."  Halcomb v. WMATA, 526 F. Supp. 2d 20, 22 (D.D.C. 2007) (quoting Gainor v. Rogers, 973 F.2d 1379, 1385 (8th Cir. 1992)).  If these facts are resolved in Cmdr. Beach's favor, then it seems likely that he would be entitled to qualified immunity.  But if the jury resolves the facts in plaintiffs' favor, and concludes that the building management representative was a fabrication, then it seems equally likely that Cmdr. Beach would not be entitled to qualified immunity because it would have been clear to a reasonable officer that his actions were unlawful under those circumstances.  See Saucier, 533 U.S. at 202.  As a result, the Court cannot resolve Cmdr. Beach's qualified immunity claim on summary judgment at this time and his claim must be denied.

    B.    **The Four Arresting Officers**

    Defendants argue that the four arresting officers are entitled to qualified immunity because they did not participate in the decision to arrest plaintiffs and they were not involved in plaintiffs' initial detention.[9]  See Defs.' Mot. at 18.  The arresting officers, along with other members of MPD's CDU, were only called to the scene after the initial detention and once the

_____

        [9] Defendants do not dispute that Officers Carruth, Latson, Payne and Sanders participated sufficiently in plaintiffs' arrests such that they may incur liability under section 1983; they simply argue that the officers are all entitled to qualified immunity from suit.

investigation was already underway.  Thereafter, they received a directive from their superior

officers to "process" the arrests and, according to defendants, they did so "based on the official

representations made to them that the detainees had entered the building without authority and

that probable cause existed to arrest for unlawful entry."  Id. at 18-19.  Plaintiffs do not dispute

most of the relevant facts pertaining to the arresting officers' involvement at the scene, but

nonetheless contend that qualified immunity should not be granted because these arrests were

made without probable cause, none of the officers conducted their own independent assessment

of probable cause, and simply following the orders of commanding officers was not reasonable

under the circumstances.  See Pls.' Second Opp'n at 2-3.  Moreover, plaintiffs claim that the

officers "ignored critical 'red flag' factors, including the possession of a key card, that in the

exercise of reasonable prudence would have merited some inquiry."  Id. at 6.

Although plaintiffs argue that the four arresting officers had an "obligation to

independently determine probable cause," id. at 4, the law is clear -- and was so at the time of

plaintiffs' arrests[10] -- that "an officer may rely on another officer's determination of probable

cause to make an arrest" even if the arresting officer does not have firsthand knowledge of the

facts supporting probable cause, Barham v. Salazar, 556 F.3d 844, 850 (D.C. Cir. 2009)

---

[10] For this duty, plaintiffs rely on language from the District Court opinion in Barham v. Ramsey, 338 F. Supp. 2d 48, 61 (D.D.C. 2004).  However, subsequent opinions by the D.C. Circuit in the same case speak of no such duty and, as discussed in this section, the most recent Barham opinion supports the conclusion that reliance on the orders of other officers is permitted as long as objectively reasonable.  See Barham v. Salazar, 556 F.3d 844, 850 (D.C. Cir. 2009). Moreover, the decision relied on by plaintiffs came several years after the conduct at issue in this case.  Hence, that opinion, and the rule that plaintiffs extract from it, cannot serve as the basis for a "clearly established" constitutional rule in this case.  Lastly, even if the purported duty to independently investigate predated the events at issue in this case, the D.C. Circuit cases discussed here establish that such a rule could not be considered "clearly established" in this Circuit at that time.

(Henderson, J., concurring); see United States v. Hensley, 469 U.S. 221, 231 (1985)

("'[E]ffective law enforcement cannot be conducted unless police officers can act on directions

and information transmitted by one officer to another and . . . officers, who must often act

swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the

transmitted information.'") (quoting United States v. Robinson, 536 F.2d 1298, 1299 (9th Cir.

1976)); United States v. Loundmannz, 472 F.2d 1376, 1379 (D.C. Cir. 1972) (probable cause

exists if officer ordering arrest has "adequate first-hand knowledge to support a finding of

probable cause" even though arresting officer does not); Daniels v. United States, 393 F.2d 359,

361 (D.C. Cir. 1968) ("There is no requirement that the arresting officer have sufficient firsthand

knowledge to constitute probable cause.  It is enough that the police officer initiating the chain of

communication either had firsthand knowledge or received his information from some person . . .

who it seems reasonable to believe is telling the truth.").  However, the law is equally clear that

an arresting officer is only permitted to rely on such representations and remain entitled to the

protections of qualified immunity if it was objectively reasonable for him or her to do so under

the circumstances.  See Barham, 556 F.3d at 850 (stating that an arresting officer's reliance on

the probable cause determination of another officer "must be objectively reasonable for him to be

clothed with qualified immunity"); Bilida v. McCleod, 211 F.3d 166, 174-75 (1st Cir. 2000)

("Plausible instructions from a superior or fellow officer support qualified immunity where,

viewed objectively in light of the surrounding circumstances, they could lead a reasonable

officer to conclude that the necessary legal justification for his actions exists (e.g., a warrant,

probable cause, exigent circumstances).").

With these principles in mind, a careful examination of the unique factual circumstances relevant to each individual officer establishes that, as a matter of law, Officers Carruth, Latson and Sanders were objectively reasonable in following orders to arrest plaintiffs and hence they are entitled to qualified immunity and common law privilege.  However, due in large part to her knowledge of the electronic keycard prior to plaintiffs' arrests and her own testimony that she did not, at the time, believe that plaintiffs lacked authority to be in the parking garage, the Court cannot conclude, based on the current record, that Officer Payne's conduct was objectively reasonable.  Therefore, the Court must, at this time, deny her qualified immunity claim, as well as her claim for common law privilege.

### 1.      Officers Carruth, Latson and Sanders

The question here is whether the reliance by Officers Carruth, Latson and Sanders on the information about the existence of probable cause and the arrest orders of their superiors was objectively reasonable given that they had little, if any, firsthand knowledge of the underlying facts upon which a probable cause determination would have been based.  Perhaps most critical to the Court's inquiry is whether any of these three officers possessed information at the time that would tend to undermine the existence of probable cause.  After a thorough review, and despite plaintiffs' assertions to the contrary, the record does not contain any such information with respect to these three officers.

The record demonstrates that Officer Michael Carruth had extremely limited knowledge of the circumstances surrounding the detention and arrest of plaintiffs, but he also lacked any knowledge that would undermine the conclusion that there was probable cause to arrest.  Officer Carruth was the arresting officer for plaintiffs Nathaniel and Timothy Meysenburg.  Defs.' Ex. R

(MPD field arrest forms).  He testified that his actions at the scene were taken at the direction of

his superior officers and that he "was advised by [one of them] that [the Meysenburgs were] in

the building and we had probable cause to make the arrest."  Deposition of Michael Carruth

("Carruth Dep.") at 8, 16.  Officer Carruth stated that he did not view himself as the arresting

officer of plaintiffs because he merely "processed" the detainees after he was advised they were

under arrest.  See id. at 11.  In his role as an officer processing the arrests, he presumed that the

officer who gave the order to arrest had established probable cause and, consequently, he carried

out the order without objection and without asking further questions.  See id. at 18-19.  He

testified that he did not have any specific recollection about what was communicated to him,

only that "these are the individuals who broke the law, unlawful entry . . . let's process them."

Id. at 26.  Officer Carruth also testified that at the time of the arrests he had no knowledge that

one of the group members possessed an electronic keycard that allowed access to the garage.  Id.

at 16.

Officer Andrea Latson was the arresting officer for plaintiff Elizabeth Bolger.  Defs.' Ex.

R.  She, too, relied on the information provided to her by her superior officer, Sergeant Malcolm

Forbes.  Officer Latson made clear that she never approached the detainees prior to the arrest;

rather, she remained in the CDU van while Sgt. Forbes and other officials conferred near the

suspects who were gathered on the sidewalk.  Deposition of Andrea Latson ("Latson Dep.") at

69.  She testified that her "probable cause came from [her] sergeant and what he advised [her]."

Id. at 23.  Officer Latson stated that after receiving the order to arrest from Sgt. Forbes, she:

> [A]sked him, well, what happened?  I know he couldn't go into detail, not that
> very moment, you know, and that's when he said that they were in the garage and
> they were in the garage without authorization and it is not 100 percent clear as to

how they got in but they were in the garage and they weren't supposed to be in
there.  No one had permission to be in there.

Id. at 77-78.  She also testified that at the time of the arrests she had not seen the electronic

keycard, nor had she heard mention of it.  Id. at 9.  She said that she was only advised of the

electronic keycard after this litigation had commenced.  Id.

Of all the arresting officers, Officer Adrian Sanders had the most knowledge of the

events that were thought to support the probable cause determination.  Officer Sanders was the

arresting officer for plaintiff Helen Johnson.  Defs.' Ex. R.  He testified that prior to the arrests he

was "told that there were people who broke into a garage and that they weren't supposed to be in

the garage."  Deposition of Adrian Sanders ("Sanders Dep.") at 119.  He also "learned that the

building management did not give them permission to be in the garage."  Id.  Additionally,

Officer Sanders testified that he was told that there was probable cause to arrest by Sgt. Forbes

and Lieutenant Phillip Lanciano.  Id. at 126.  According to Officer Sanders, the conversations

that he had with his fellow officers along with his own observations supported his belief that

there was probable cause.  Id.

With respect to the electronic keycard, Officer Sanders said that he did not have any

information about the keycard when he arrived on the scene.  Id. at 152.  Nor did he have any

information about the existence of a keycard, whether from a detainee or a fellow officer, prior

to the arrests.  Id. 127-28.  His testimony was clear that he was not aware of the actual existence

of the electronic keycard until after the arrests when plaintiffs were being transported from the

scene for further processing.  Id. at 135-36 ("[A]fter the transport condition, then we learned that

there was an access card.").

Officer Sanders's order to arrest came from Lt. Lanciano, who told him:  "Let's lock them up."  Id. at 111.  Officer Sanders testified that when an order is given in a CDU situation there is little time for conversation or further questions.  See id. at 31.  But he also testified that this limitation did not present a problem for him in this situation because

> [H]ad I believed at the time that the arrest was unlawful, that would be an entirely different situation, but because I believed at the time that there was baseline probable cause, I didn't object to what we were doing.  Now, when the issue with the pass card came up later on, that -- at that point, which was a time later, there was an opportunity to discuss.

Id. at 127.  Despite learning of the keycard after the arrests, Officer Sanders was clear that based on the information available to him at the time of the arrests, he believed that plaintiffs lacked the lawful authority to be inside the garage.  Id. at 148.

Plaintiffs' primary argument against qualified immunity for these three officers rests with the assertion that "[t]hey knew of evidence negating probable cause and yet arrested plaintiffs anyway."  Pls.' Second Opp'n at 2.  The Court simply does not agree.  With respect to these three officers, plaintiffs strain the record to find any support for the proposition that the officers had information, prior to the arrests, that would undermine the existence of probable cause and make their conduct objectively unreasonable.

Plaintiffs attack Officer Carruth for his general lack of knowledge about the underlying basis for probable cause, and they point to the fact that he did not even know who ordered the arrests as evidence of his unreasonableness.  Id. at 6-7.  Officer Latson's conduct is characterized as unreasonable because she acknowledged that she relied on her superior officer, Sgt. Forbes, for probable cause yet he did not even know plaintiff Bolger's method of entry into the garage.  Id. at 7-8, 11.  Finally, plaintiffs impugn Officer Sanders's conduct because he also lacked

information about the method of entry into the garage and he did not investigate whether plaintiffs possessed a keycard when he had overheard some talk about an access card prior to the arrests. Id. at 9, 12-13. Plaintiffs, however, fail to acknowledge that Officer Sanders did not actually become aware of the existence of the electronic keycard until after the arrests, a point clarified multiple times in his deposition testimony. See Sanders Dep. at 127-28, 135-36, 152.

Although plaintiffs try mightily to argue that these officers possessed information at the time of the arrests that would tend to undermine the existence of probable cause, the record simply does not support such a conclusion. In reality, plaintiffs would like the Court to second-guess the conduct of these officers and withhold the protection of qualified immunity based largely on the fact that they could have, arguably, undertaken a more active role at the scene by attempting to build an independent basis for probable cause. But the law is clear that these officers were entitled to rely on the arrest orders of their superior officers even if they themselves had scant firsthand knowledge of the underlying facts that were thought to support probable cause at the time. See Loundmannz, 472 F.2d at 1379; Daniels, 393 F.2d at 361. Moreover, the record does not reveal any facts that suggest that it was unreasonable for these officers to rely on the representations of their superiors with regard to the existence of probable cause (even if its existence may have, in fact, been questionable) and the ultimate decision to arrest. Therefore, the Court concludes that based upon the uncontroverted record evidence, the conduct of Officers Carruth, Latson and Sanders was objectively reasonable; hence, they are entitled to qualified immunity from suit under section 1983.

The arresting officers also assert that they are entitled to common law privilege, which would immunize them from suit on plaintiffs' common law false arrest claims. Defs.' Mot. at 20.

Under D.C. law, a police officer can justify an arrest, and establish that it was privileged, "by demonstrating that '(1) he or she believed, in good faith, that his or her conduct was lawful, and (2) this belief was reasonable.'" Scott, 101 F.3d at 754-55 (quoting District of Columbia v. Murphy, 631 A.2d 34, 36 (D.C. 1993) (internal citations and quotations omitted)).  "In making this inquiry, good faith is to be evaluated from the perspective of the arresting officer, rather than that of the plaintiff." Liser v. Smith, 254 F. Supp. 2d 89, 96 (D.D.C. 2003) (citing Murphy, 631 A.2d at 36-37).  Having already concluded that their conduct was objectively reasonable, the Court also concludes that Officers Carruth, Latson and Sanders exhibited the good faith, reasonable belief necessary for common law privilege.  As the Court concluded in Liser, even when probable cause to arrest is based on a mistake of fact:  "Without any evidence that [the officer] possessed information to the contrary, his mistake cannot be said to be the product of bad faith; without any evidence that the source of his information was untrustworthy, his good faith mistake cannot be said to be unreasonable." Id. at 100.  Such evidence is lacking here and, accordingly, these three individual defendants are entitled to summary judgment on plaintiffs' common law claims for false arrest and false imprisonment.

### 2.    Officer Payne

Several critical facts distinguish Officer Payne's case from those of her colleagues and make it impossible, at this time, for the Court to grant her qualified immunity.  Officer Payne was the only one of the arresting officers who was aware that one of the group members possessed an electronic keycard prior to the arrests, and she testified that she knew at the time that this fact potentially undermined the existence of probable cause.  She also testified that at the time of the arrests she did not believe that plaintiffs lacked authority to be on the premises.

Lastly, Officer Payne's testimony implies that she carried out the arrests not because she had a reasonable belief that the directives of her superior officers were lawful, but rather because she believed she had no choice but to follow the chain of command.  Considered together, these facts preclude a finding at this time that Officer Payne's conduct was objectively reasonable.

Officer Payne was the arresting officer for plaintiffs Jessica Lahood and Debra Smith. Defs.' Ex. R.  After arriving at the scene, Officer Payne estimates that she remained in the CDU van for thirty to forty-five minutes.  Deposition of Wendy Payne ("Payne Dep.") at 43-44.  Sgt. Forbes eventually approached the van and notified Officer Payne and her squad that they could get out of the van because the detainees were going to be arrested.  Id. at 51.  When she asked Sgt. Forbes what was going on he told her "to go with the flow until we find out further notice." Id.  Once out of the van, Officer Payne said that she observed Cmdr. Beach talking to Lt. Lanciano and immediately thereafter Lt. Lanciano approached her and other members of CDU and told them that they were going to be the arrest team.  Id. at 52-53.  Sgt. Forbes also told her that the detainees were being charged with unlawful entry, but he did not convey any further information to her about the conduct that led to their arrest or their method of entry into the garage.  Id. at 54.  Officer Payne testified that she did not "make any independent evaluation as to whether probable cause existed to arrest" because she had a direct order to arrest from her superior officer or "official."  Id. at 57.  After receiving the order to arrest from Sgt. Forbes, Officer Payne said "the only question was, what are they being charged with, and that's when he informed us unlawful entry."  Id. at 58.

Officer Payne testified that at the time of the arrests she was aware that one of the detainees had an access card to the garage.  Id. at 61 ("Q: At the time of the arrests, did you

know that one of the people within the group that was arrested had an electronic access swipe card to get into the garage? A: It was mentioned, but I don't recall by whom.").  Officer Payne later clarified that she learned this information because she heard Sgt. Forbes and Lt. Lanciano discussing it.  Id. at 62 ("I cannot quote directly what they were saying.  I did hear them saying there was a probability one of them had a key card.").  She testified that this information gave her pause about carrying out the arrests.  Id. ("Q: Did that information give you any pause in terms of participating in these arrests? A: Yes.").  Officer Payne stated that she was concerned at the time "[b]ecause if he had a key card, he had access to the building.  That gives him authorization, if it was issued from the building."  Id.  Despite this concern, Officer Payne did not ask any follow-up questions of Sgt. Forbes or Lt. Lanciano or offer any objections -- she simply carried out her orders.  Id. at 63 ("Q: Did you object at any point in time, like along the lines of hey, if they had a key card, we really shouldn't be locking them up for unlawful entry? A: Well, I had a direct order, and once I get that direct order, that's what we have to abide by.").

        In her deposition, Officer Payne also stated that she did not believe at the time of the arrests that the three individuals she was arresting lacked authority to be in the parking garage.  Id. at 60-61 ("Q: Based on the information that you knew at the time of the arrests, did you believe that your arrestees lacked the lawful authority to be inside the garage?  A: No.").  She also stated that she did not believe, at the time of the arrests, that any of the individuals had been given an order to leave the premises or had refused to leave the premises.  Id. at 61.  When asked if she understood "that within your responsibility or authority that you are entitled to object or ask for clarification of an order where you believe that there's a civil rights violation," Officer Payne responded:  "Right, but unfortunately, in MPD, when an officer and a lieutenant comes to

you and gives you a direct order that's what you do." Id. at 64.  She further testified that she

thought she lacked authority to ask for clarification about the circumstances of the arrests

"[b]ecause [she is] an officer, and they are officials." Id. at 65.

Officer Payne contends that her conduct was reasonable because she learned of the

possibility of the keycard from Sgt. Forbes and Lt. Lanciano and it was these same superior

officers who gave the order to arrest.  See Defs.' Reply at 14.  Hence, according to her, "when the

order to arrest came through these same superiors [she] could reasonably conclude that the

probable cause determination took into account the key card." Id.  Officer Payne also tries to

mitigate the impact of her testimony regarding her belief that her arrestees did not lack authority

to be on the premises.  She argues that this testimony merely acknowledged "that she had no

personal knowledge to form such a belief [and] . . . [t]here is no dispute that the defendant

officers generally lacked such personal knowledge." Id. at 15 n.3.

The Court finds these interpretations of Officer Payne's testimony unconvincing.  It is

clear from the totality of her deposition testimony that she doubted the existence of probable

cause at the time of the arrests and that she disregarded these doubts and carried out the arrests

without objection or inquiry because she was given a direct order to do so by her superior

officers.  When viewed in context, Officer Payne's interpretation of her own testimony is self-

serving and speculative and, in any event, is insufficient to recast her conduct as objectively

reasonable.

The Court acknowledges that assessing the reasonableness of Officer Payne's conduct is

made somewhat more difficult in light of the genuine issues of material fact that are at the core

of this case.  Much like in Cmdr. Beach's circumstance, if the jury resolves key facts in favor of

defendants, then the facts supporting Officer Payne's qualified immunity claim may look drastically different at the close of trial than they do today.  However, the Court is at this moment tasked with evaluating Officer Payne's qualified immunity claim in light of the record as it now stands.  On that record, and given the genuine factual issues relating to probable cause and her assessment on the scene, the Court cannot conclude that Officer Payne's conduct was objectively reasonable in light of the circumstances that she confronted at the scene in the time leading up to plaintiffs' arrests on April 20, 2002.  As a result, Officer Payne's qualified immunity claim will be denied.  Because the Court has concluded that Officer Payne's conduct was not objectively reasonable, it also cannot conclude that she acted with the requisite good faith, reasonable belief in the lawfulness of her conduct for common law privilege to attach.  See Scott, 101 F.3d at 754-55; Murphy, 631 A.2d at 36.  Consequently, the Court will also deny Officer Payne's motion for summary judgment on plaintiffs' common law claim of false arrest and false imprisonment.

III.    **Section 1983 Claim Against the District of Columbia**

In their motion, defendants state that they are moving "for summary judgment on all claims against them in this matter."  Defs.' Mot. at 1.  However, defendants' motion fails to address plaintiffs' claim against the District for municipal liability under section 1983. Generally, a local government cannot be held liable under section 1983 for a constitutional tort committed by its agent or employee because respondeat superior does not apply.  Monell v. Dep't of Social Servs. of City of New York, 436 U.S. 658, 690-95 (1978).  However, the Supreme Court has established that municipalities may be held liable under section 1983 if the injuries occurred pursuant to the "government's policy or custom, whether made by its

lawmakers or by those whose edicts or acts may fairly be said to represent official policy."  Id. at

694.

There is no dispute that the Second Amended Complaint states a so-called Monell-style

section 1983 claim alleging that plaintiffs' injuries were caused, at least in part, by the District's

"policies or customs exhibiting deliberate indifference to the constitutional rights of protestors,

and also of Anarchists or persons perceived to be Anarchists."  Second Am. Compl. ¶ 51.

Because defendants have failed to address this claim in their motion, summary judgment on this

basis will be denied.

## IV.    Plaintiffs' Request for Sanctions

Plaintiffs have also requested sanctions against the District, in the form of an adverse

inference instruction, based on the destruction of recorded police radio communications sought

during discovery.  This Court has already sanctioned the District once during the course of this

case for its failure to produce certain materials in response to plaintiffs' discovery requests and

orders of this Court.  See Bolger v. District of Columbia, 248 F.R.D. 339 (D.D.C. 2008).

Although the Court's prior findings have some general relevance here, the operative facts are

unique to the instant request and will be recounted briefly below.

According to plaintiffs, the "radio runs" or recorded police channel communications at

issue here were destroyed at some time in 2006 "after the MPD engaged in ad hoc non-routine

and undocumented 'heavy purging' of recorded police communications."  Pls.' Updated Request

for Sanctions ("Pls.' Request") at 1; see Deposition of James Crane ("Crane Dep.") at 6-7, 11-13.

The destruction of these radio communications is particularly troubling from plaintiffs'

perspective because it occurred years after the first discovery requests for such materials were

made and months <u>after</u> Office of the Attorney General ("OAG") counsel Thomas Koger certified

that the District "has no radio runs recorded during or related to the protests of April 20, 2002

and the arrests of plaintiffs."  Pls.' Request, Ex. 2 at 38 (Def. D.C.'s Responses to Pls.' Second

Request for Production of Documents and Things (May 2, 2005)).

The District counters by asserting that "[t]o the extent that recordings were lost that

might have related to this case, such loss was the unintentional result of a routine operation of

the police communications system."  Def. D.C.'s Response to Pls.' Updated Request for

Sanctions ("Def.'s Response") at 1.  This routine operation was a purge of past recorded

communications that, according to the District, "was necessary to allow police communications

to have enough memory to continue recording new radio communications."  <u>Id.</u> at 3; <u>see</u> Crane

Dep. at 7.  Although the District concedes that it made some errors by not immediately putting in

place a litigation hold when this action commenced and by failing, until at least April 2006, to

contact MPD's Office of Communications -- the office where the recorded radio communications

were stored prior to their destruction -- the District nonetheless maintains that an adverse

inference instruction is unwarranted here because "the recordings were minimally relevant,

cumulative of other available evidence, and at any rate, would not have supported plaintiffs'

claims in this case."  Def.'s Response at 1.

The parties agree that three elements must be satisfied to warrant an adverse inference:

(1) the party having control over the evidence had an obligation to preserve it when
it was destroyed or altered; (2) the destruction or loss was accompanied by a
"culpable state of mind"; and (3) the evidence that was destroyed or altered was
"relevant" to the claims or defenses of the party that sought the discovery of the
spoliated evidence, to the extent that a reasonable factfinder could conclude that the
lost evidence would have supported the claims or defense of the party that sought it.

<u>Mazloum v. District of Columbia Metro. Police Dep't</u>, 530 F. Supp. 2d 282, 291 (D.D.C. 2008)

(quoting Thompson v. HUD, 219 F.R.D. 93, 101 (D. Md. 2003) (internal citations omitted)).

The District does not dispute that the first element is satisfied here because it was under an

obligation to preserve the evidence at the time it was destroyed and it failed to do so.  See Def.'s

Response at 4.  With regard to the second and third elements, however, the District is adamant

that they have not been satisfied.

The District contends that it did not act with a "culpable state of mind" for two reasons.

First, the District argues that it made efforts to locate radio runs, which normally would have

been signified by an "event" in MPD's Computer-Aided Dispatch ("CAD") system.  Because

there was no CAD event related to a request for police service at 1275 K Street, N.W., on April

20, 2002, the District certified that it had no radio runs relating to plaintiffs' arrests.  See

Declaration of Anne Grant ("Grant Decl.") ¶ 4.  The District does concede, however, that it erred

by focusing only on radio runs "and not considering the possibility that some recorded police

channels might still have captured transmissions related to the arrests."  Def.'s Response at 5.

Second, the District asserts that "the purge was the result of a normal, routine operation of the

police communications system."  Id.  The District admits that the purges did not occur at

regularly defined intervals, but claims that they "were nevertheless routine, periodic events

occurring whenever the system was reaching capacity."  Id.  Both of these facts, the District

argues, demonstrate that it did not act with the requisite "gross negligence or bad faith" needed

to satisfy the second element for an adverse inference.

Plaintiffs cite a laundry list of evidence to support their position that the District did, in

fact, act with "gross indifference or reckless disregard" in destroying the recorded radio

communications.  See Pls.' Request at 3-4; see also Rice v. United States, 917 F. Supp. 17, 20

(D.D.C. 1996).  In brief, that evidence includes:  the District's failure to issue a litigation hold; the District's December 31, 2003 discovery response erroneously representing that no responsive materials existed apart from sealed arrest records, <u>see</u> Pls.' Request, Ex. 4 (Pls.' Limited Discovery to Defs.); the District's mistaken February 25, 2005 discovery certification that it "has no radio runs recorded during or related to the protests of April 20, 2002 and the arrests of plaintiffs," Pls.' Request, Ex. 2 at 38; the District's incomplete representation, in an April 7, 2006 status report (Dkt. No. 61) filed in response to the Court's February 15, 2006 Order, that it had supplemented its discovery responses and that they were complete despite the District's failure to contact the Office of Police Communications to search for recorded radio communications prior to making this representation, <u>see</u> Crane Dep. at 5-6, 16-17; and the District's failure to contact the MPD's Office of Police Communications to search for recorded radio communications until May 2006 when it finally did so in response to the Court's May 2, 2006 Order, but by which time the relevant recordings had already been destroyed, <u>see</u> <u>id.</u>

This Court has recognized that "the adverse inference doctrine embraces negligent (in addition to deliberate) destruction of evidence." <u>Mazloum</u>, 530 F. Supp. 2d at 292; <u>see also</u> <u>More v. Snow</u>, 480 F. Supp. 2d 257, 275 (D.D.C. 2007).  Consequently, the District's stance that it did not act with "gross negligence or bad faith" is of no moment.  Moreover, given the District's poor track record in satisfying its discovery obligations in this case, the Court cannot help but view the District's proffered explanation for its destruction of evidence with a jaundiced eye.  Based on the facts recited above, the Court concludes that <u>at a minimum</u> the District was negligent in allowing the police radio communications to be destroyed.  Therefore, plaintiffs have established the requisite "culpable state of mind" for an adverse inference instruction.

The final element of "relevance" requires a determination whether "a reasonable trier of fact could infer that 'the destroyed . . . evidence would have been of the nature alleged by the party affected by its destruction.'"  Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 109 (2d Cir. 2002) (internal citations omitted); see Mazloum, 530 F. Supp. 2d at 293 (citing Residential Funding, 306 F.3d at 109).  It is at this final step of the adverse inference inquiry that the limited record currently before the Court presents some difficulties.

Plaintiffs allege that two types of evidence relevant to their claims were lost by the destruction of the recorded radio communications:  (1) evidence of defendants' discriminatory intent and animus against those perceived to be anarchists (i.e., evidence supporting their First Amendment claims), and (2) evidence of defendants' knowledge at the time of the arrests regarding the existence, or non-existence, of the building management representative (i.e., evidence supporting their Fourth Amendment claims).  See Pls.' Request at 6-7.  Plaintiffs cite to Cmdr. Beach's deposition testimony as support for the claim that the destroyed recordings contained evidence of discriminatory intent or animus.  As a general matter, Cmdr. Beach testified that he would expect that there would have been information recorded over the various police channels related to plaintiffs' arrests.  See Beach Dep. at 89-91.  He also said that on at least one occasion that day he referred to persons "dressed in black, anarchists, using that term," over a recorded police radio channel.  Id. at 124.  With respect to the second type of evidence related to probable cause, plaintiffs point to the timeline of events surrounding their arrests for support.  Pls.' Request at 7.  Specifically, plaintiffs assert that the gap of only twelve minutes between a report that there was no complainant on the scene (1825 hours), Pls.' Request, Ex. 11 (J.O.C.C. running resume), and the time that, according to Officer Cadle's notes, plaintiffs were

arrested (1837 hours), Pls.' Request, Ex. 12 (Cadle notes), creates the reasonable inference that there may have been radio communications about the presence or absence of a complainant from the building management company.

Not surprisingly, the District argues that "the importance of the [destroyed] evidence to the plaintiffs' claims is minimal" and "[p]laintiffs present only wild speculation" to support their assertion that the lost recordings would have supported their claims.  Def.'s Response at 5, 7.  As to the first type of evidence, the District argues that the scope of information that was potentially lost is very narrow and, in any event, plaintiffs possess adequate substitute evidence because there is ample evidence in the record that Cmdr. Beach and other law enforcement officers referred to the group members as anarchists.  See id. at 6-7.  With regard to the latter type of evidence, the District simply dismisses plaintiffs' proffer as "wild speculation" and asserts that there is no reasonable basis from which to infer that the lost recordings would have contained statements supporting plaintiffs' contention that the building management complainant was fictional.  See id. at 7.

Although the Court sympathizes with plaintiffs here, it cannot grant plaintiffs' request at this time.  Put simply, plaintiffs have asked too much.  In the Court's view, on the record currently before it, a reasonable trier of fact could not infer that the destroyed recordings would have contained evidence of retaliatory intent or animus beyond the identifying statements (i.e., persons dressed in black, anarchists) already acknowledged by the District.  Nor could a reasonable jury infer that there would have been evidence tending to disprove the existence of the building management company's mystery complainant.  Plaintiffs' proffer with respect to this evidence is too speculative at this time.  However, because plaintiffs have made the necessary

showing on the first two elements -- and the Court believes that a record developed fully during the course of trial could potentially provide plaintiffs with the support necessary to warrant an adverse inference instruction -- the Court will deny plaintiffs' request without prejudice and will allow them to renew their request at an appropriate time after sufficient proof has been adduced at trial.  The adverse inference they seek, after all, would be part of the jury instructions finalized at the close of the trial.

## **CONCLUSION**

For the foregoing reasons, the Court will deny plaintiffs' motion for summary judgment on the issue of Commander Beach's liability and it will deny plaintiffs' request for sanctions without prejudice.  The Court will enter judgment in favor of defendants on those claims as to which plaintiffs have not opposed dismissal, but it will deny defendants' summary judgment motion in all other respects with the exception of qualified immunity, which will be granted only as to MPD Officers Michael Carruth, Andrea Latson and Adrian Sanders at this time.

In the interest of moving efficiently toward a trial on the remaining issues in this case, a scheduling conference with the Court shall be held on April 23, 2009 at 9:00 a.m. in Courtroom 8.  A separate Order accompanies this Memorandum Opinion.

_____/s/_____
JOHN D. BATES
United States District Judge

Dated:  March 31, 2009